253 So.2d 302

**Edward Albert SEIBOLD**

v.

**STATE of Alabama.**

**5 Div. 868.**

Supreme Court of Alabama.

July 16, 1970.

After Remandment Dec. 17, 1970.

Rehearing Denied Oct. 7, 1971.

———◇———

Walker, Hill & Gullage, Opelika, for appellant.

MacDonald Gallion, Atty. Gen., and W. Mark Anderson, III, Special Asst. Atty. Gen., for the State.

LIVINGSTON, Chief Justice.

On November 7, 1967, the grand jury of Lee County, Alabama, returned an indictment against the appellant, Edward Albert Seibold, hereinafter referred to as defend-

ant, for murder in the first degree in the killing of Mary Lynn Sinclair.

The defendant was apprehended in the state of Florida and, following extradition proceedings, was returned to this state on December 17, 1967. Arraignment was originally scheduled for December 22, 1967, but on defendant's motion was continued until December 27, 1967. On that date, with his attorneys present, the defendant, prior to entering pleas to the merits, filed a "Motion for Investigation of Sanity of Defendant," pursuant to the provisions of Section 425, Title 15, Code 1940, Recompiled in 1958. This motion was accompanied by the affidavit and letter, respectively, of two reputable specialist practitioners in mental and nervous diseases. The court denied the motion on the same day, but granted leave to refile said motion after the defendant had been examined by a third reputable specialist practitioner in mental and nervous diseases.

The defendant then filed a plea in abatement which set forth that he was presently insane and incapable of competently assisting in his defense and praying the court to abate prosecution of the cause until such time as his sanity had been restored to him. The defendant further prayed the court to set the plea down for a determination by a jury under the provisions of Section 426, Title 15, Code 1940, Recompiled in 1958. The state's motion to strike the plea in abatement was granted.

The defendant entered pleas of not guilty and not guilty by reason of insanity.

On January 8, 1968, a "Second Motion for Investigation of Sanity of Defendant" was filed. Said motion was accompanied by the affidavits of three reputable specialist practitioners in mental and nervous diseases. The court heard ore tenus the testimony of Dr. Howard S. Weldon. The motion was denied.

Thereupon, the defendant filed a "Motion for Inquiry into Mental Condition of Defendant Before Trial," pursuant to the provisions of Section 426, supra. On January 12, 1968, said motion was denied by the court.

Trial was commenced on January 15, 1968, and on January 20, 1968, the jury returned its verdict of guilty of murder in the first degree and imposed the death penalty. Judgment and sentence in accord with the verdict were pronounced by the trial court on the same day.

The appeal before this Court is under the automatic appeal statute applicable in cases where the death penalty is imposed. Act No. 249, General Acts of Alabama 1943, p. 217, Title 15, Sec. 382(1), et seq., Code 1940, 1955 Cum.Pocket Part, 1958 Recompiled Code of Alabama.

Upon proper investigation, the defendant was determined to be indigent within the language of Section 382(1) et seq., supra. The trial court appointed counsel who had represented the defendant in a retained capacity in the trial to represent him on this appeal.

The facts pertinent to the commission of the offense for which the defendant was tried and convicted are undisputed. We deem it unnecessary that such facts be set out in great detail in this opinion. The defense was based primarily, if not solely, on the plea of not guilty by reason of insanity.

On the night of September 6, 1967, Mrs. Juanita Sinclair, her four daughters, and a neighbor's daughter were in the Sinclair residence in Auburn, Alabama. The Sinclair children, ranging in age from nine to twenty, were Mary Lynn (the youngest), Elizabeth, Faye, and Cathey (the oldest). The neighbor's child, Mary Durant, age 9, was spending the night in the Sinclair residence as the guest of Mary Lynn.

Shortly before midnight, Mrs. Sinclair retired on the sofa in the living room, located on the intermediate and ground level of the tri-level structure. Cathey was sewing in the den, located on the lower level. The other Sinclair children and the Durant child were sleeping in bedrooms on the upper level. At approximately 11:50 P.M.,

an intruder, identified as the defendant, forcibly broke open the door leading from the outside into the living room, entered, and, from a shotgun which he carried, fired a shot which struck Mrs. Sinclair in the arm. The defendant then descended the stairs to the lower level. Cathey, upon hearing the initial commotion upstairs, concealed herself in a closet temporarily, then escaped the house via a window. The defendant, upon reaching the lower level, entered a bedroom adjacent to the den, where he fired a shot from the shotgun into a life-size doll which was sitting on a bed. He re-traced his steps to the intermediate level, and then continued up the steps to the upper level. As he ascended the stairs to the upper level, Mrs. Sinclair escaped from the house via the doorway through which the defendant had entered. In the driveway outside the house, Mrs. Sinclair met Cathey and together they proceeded to the residence of Dr. Thomas, a neighbor, located some 500 feet from the Sinclair residence.

On the upper level, Elizabeth and Faye had been sleeping in one bedroom; Mary Lynn and Mary Durant had been sleeping in another. As the defendant opened the door and entered the bedroom in which Elizabeth and Faye were situated, Faye slipped underneath the bed, where she remained undiscovered by the defendant. According to Faye's testimony, Elizabeth attempted to arise from the bed as the defendant neared, but fell back onto the bed when the defendant swung the shotgun which he carried. As Elizabeth again arose from the bed, the defendant demanded that she tell him the whereabouts of Mrs. Sinclair and Cathey. Elizabeth stated that she did not know. The two then paced back and forth in the hallway, continuing to argue, until Faye heard what she described as "sort of a gurgling noise," and then silence.

From her place of concealment underneath the bed, Faye heard the telephone ring several times and then stop. After a short period, the telephone again began to ring. Faye crawled from underneath the

bed, descended the stairs to the intermediate level, where the telephone was located, and answered it. She told the caller, a neighbor who lived to the rear of the Sinclair residence, to get Dr. Thomas and the police.

Faye then returned to the upstairs, where, upon examining Elizabeth's body, she detected no pulse. She then proceeded into the bedroom in which Mary Lynn and Mary Durant had been sleeping. On the bed were the bodies of the girls, both of which were covered with blood. Upon examination, Faye detected no pulse in the body of either girl. She then descended the stairs to the intermediate level and exited the house via the doorway leading from the living room onto the carport, where she met Dr. Thomas and several policemen.

The testimony at trial tended to show that Cathey had met the defendant in 1966, at which time they attended the same class at Auburn University. They dated over a period of time and the defendant became well known in the Sinclair household. The relationship between the defendant and members of the Sinclair family seemed to deteriorate after Cathey left for Wellesley College in the fall of 1966, with only sporadic meetings between the defendant and Cathey and the defendant and other members of the Sinclair family. The testimony elicited relative to the defendant's relationship with the Sinclair family primarily pertained to the plea of not guilty by reason of insanity. In view of the questions presented on this appeal, a detailed recitation of that relationship is not required.

In argument, the defendant strongly urges that the trial court committed error to reverse in its rulings on the various motions interposed pursuant to Section 425, supra, and Section 426 et seq., supra, respectively.

In support of the "Motion for Investigation of Sanity of Defendant," filed on December 27, 1967, the defendant filed the affidavit of Dr. Charles E. Herlihy, dated December 26, 1967, and a letter from Dr.

Hugo Waldheim, Jr., dated December 11, 1967. The position taken in the motion was that the defendant was at the time in confinement under an indictment for murder in the first degree and that said defendant was then insane in the opinion of Dr. Herlihy, a specialist practitioner in mental and nervous diseases, and, based upon the letter from Dr. Waldheim, a specialist practitioner in mental and nervous diseases, there was reasonable ground to believe that the defendant was presently insane. It was set forth in the motion that Dr. Charles H. Smith, also a specialist practitioner in mental and nervous diseases, would soon examine the defendant and submit a written report thereof to the court. Said motion prayed that a hearing on the motion be continued until such time as the written report of Dr. Smith was made available to the court and that upon hearing of said motion an order be made ordering the Sheriff of Lee County to deliver the defendant to the Superintendent of the Alabama State Hospitals for the purpose of determining the mental condition of the defendant and making a written report thereof to the court, pursuant to the provisions of Section 425, supra.

Section 425 of Title 15, supra, provides, in pertinent part, as follows:

"§ 425.  *Investigation of sanity of person charged with capital offense.*—Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, by the written report of not less than three reputable specialist practitioners in mental and nervous diseases, appointed by the judge, or by the written report of the superintendent of the Alabama state hospitals, that there is reasonable ground to believe that such defendant was insane either, at the time of the commission of such offense, or presently, it shall be the duty of the presiding judge to forthwith order that such defendant be delivered by the sheriff of the county to the superintendent of the Alabama state

hospitals, who is charged with the duty of placing such defendant under the observation and examination of himself and two members of his medical staff to be named by him, constituting a commission on lunacy, with the view of determining the mental condition of such defendant and the existence of any mental disease or defect which would affect his present criminal responsibility, or his criminal responsibility at the time of the commission of the crime. * * *"

Section 425, supra, expressly provides that the knowledge of the presiding judge as to the mental condition of an accused is to be obtained " * * * *by the written report of not less than three reputable specialist practitioners in mental and nervous diseases, appointed by the judge, * * *.*" In the case under review, the trial judge made no such appointments as are contemplated by the language of Section 425, supra. The specialist practitioners who examined the defendant and submitted their written reports in support of the motion were not appointed by the trial judge.

Also, under Section 425, supra, the court is under no duty to appoint a lunacy commission or to procure the report of the Superintendent of the Alabama State Hospitals; the court, *in its discretion,* has simply the right to seek these aids when such reports may be deemed helpful. Howard v. State, 278 Ala. 361, 178 So.2d 520; Divine v. State, 279 Ala. 291, 184 So. 2d 628. The question of the appointment of medical specialists in mental disorders in response to a motion is solely within the discretion of the trial court. Coon v. State, 278 Ala. 581, 179 So.2d 710; Tiner v. State, 279 Ala. 126, 182 So.2d 859.

The "Second Motion for Investigation of Sanity of Defendant" was filed pursuant to the provisions of Section 426, supra, which, in pertinent part, provides as follows:

"§ 426.  *Inquisition in certain cases of felony; proccedings.*—If any person charged with any felony be held in con-

finement under indictment, and the trial court shall have reasonable ground to doubt his sanity, the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity, such jury to be impaneled from the regular jurors in attendance for the week or from a special venire, as the court may direct. If the jury shall find the accused sane at the time of their verdict, they shall make no other inquiry, and the trial in chief shall proceed. If they find that he is insane at that time, the court shall make an order committing him to the Alabama state hospitals, where he must remain until he is restored to his right mind. \* \*"

■ Under Section 426, supra, it is within the discretion of the trial court to grant or refuse a motion to execute an inquisition as to the mental status of the defendant at the time of trial. Granberry v. State, 184 Ala. 5, 63 So. 975; Burns v. State, 246 Ala. 135, 19 So.2d 450. Furthermore, the refusal of the trial court to suspend the trial and submit to a jury an inquisition as to the defendant's sanity under the provisions of this section at the time of trial is not revisable on appeal. Rohn v. State, 186 Ala. 5, 65 So. 42; Whitfield v. State, 236 Ala. 312, 182 So. 42.

The defendant argues in brief that he was denied those basic rights guaranteed by the Constitution as those rights are defined in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, in the refusal of the trial court to grant a hearing as to his mental condition at the time of trial. In Pate v. Robinson, supra, the Supreme Court held that the respondent, Robinson, was constitutionally entitled to a hearing on the question of his competency to stand trial. Counsel failed to demand a hearing as to the respondent's competency to stand trial, but contended throughout the trial that the respondent was insane both at the time of the homicide and at the time of trial. The ruling of the Supreme Court is directed solely to the question of the respondent's competency to stand trial, and

not to his mental condition at the time of the commission of the homicide.

■ In the instant case, the record shows that three motions, each of which was directed to the ordering of an examination to determine the then present mental condition of the defendant, were filed by defense counsel. The reports of reputable specialist practitioners were filed in support of the respective motions and, in the case of the "Second Motion for Investigation of Sanity of Defendant," the court heard ore tenus the testimony of Dr. Howard S. Weldon prior to ruling on said motion. The record further shows that, at the time the court ruled on the respective motions, the defendant, defense counsel, and the district attorney were present. Arguments by counsel were heard by the court. A "hearing" ordinarily is defined, in matters not associated with full trials, as a proceeding in which both parties are afforded an opportunity to adduce proof and to argue (in person or by counsel) as to the inferences flowing from the evidence. Fiorella v. State, 40 Ala.App. 587, 121 So.2d 875, cert. denied 270 Ala. 737, 121 So.2d 881. We find no constitutional infirmity in the hearings accorded the defendant on the respective motions filed in the case under review.

■ In brief, the defendant cites Lee v. State, M.D.Ala.1967, 291 F.Supp. 921, in support of the contention that such a hearing as is contemplated in Pate v. Robinson, supra, was not accorded the defendant. It is well settled that the decisions of federal courts other than the Supreme Court are not binding on a state court of last resort. Lokos v. State, 278 Ala. 586, 179 So.2d 714.

In direct examination of Dr. Herlihy, counsel for the defendant asked: "Doctor, in your opinion, based upon the events related to you by Eddie Seibold, do you have a judgment as to whether or not the acts of violence for which he is now on trial were the sole proximate result of the mental illness that he is now suffering

from and that he was suffering from in September of 1967?" In sustaining the State's objection thereto, the lower court stated: "That is a question for the jury and the objection is sustained. That is entirely a question for the jury." The defendant reserved an exception to the court's ruling.

Counsel for the defendant then asked: "Doctor, do you have an opinion as to whether the acts which he has related to you and for which he is on trial here were the result of a mental illness which this man was suffering from in September of 1967?" Again, the court sustained the State's objection, stating: "He can testify as to his mental illness, but in the opinion of the court, respectfully, Mr. Walker, that is a question for the jury. The Doctor can testify about his mental condition but after all, as to whether he is guilty or not guilty by reason of insanity is going to be a question for the jury."

It is apparent that in propounding the above questions defense counsel sought to frame the questions within the context of Parsons v. State, 81 Ala. 577, 2 So. 854. However, as stated in Boyle v. State, 229 Ala. 212, 154 So. 575:

> "We hesitate to take from the jury any case where there is evidence of conscious guilt at the moment the deed was perpetrated. In saying this, we do not question the legal rule that, despite knowledge of wrongdoing as related to the act, there may be such disease of the mind as to completely destroy the power to choose. *In such case, it is for the jury to say whether such disease was the sole cause of the deed.*" (Emphasis added.) Id., at 224, 154 So., at 586.

■ The trial judge correctly sustained the State's objections to the questions posed by defense counsel, on the basis that such questions called for answers invasive of the province of the jury.

■ The defendant argues that the trial court committed error to reverse in refusing to grant the defendant's motion for a continuance in the trial of the cause. The matter of continuance in a criminal trial is addressed to the trial court's discretion, the exercise of which will not be disturbed unless clearly abused. Divine v. State, 279 Ala. 291, 184 So.2d 628; Bosarge v. State, 273 Ala. 329, 139 So.2d 302.

■ The motion for a continuance in the trial of the cause was overruled by the trial court on December 27, 1967. Trial date had earlier been set for January 15, 1968, which afforded defense counsel approximately three weeks in which to complete the preparation of the case for the defense. We find no abuse of the trial court's discretion in this respect and consequently no error to reverse.

On direct examination of the defendant's mother, defense counsel asked: "Mrs. Seibold, state whether or not after that incident which you have just testified about you were, yourself, in fear." The objection of the State was sustained, whereupon defense counsel repeated the request in essentially the same form. Again, the State's objection was sustained and defense counsel duly excepted thereto.

The above questions by defense counsel followed certain testimony of Mrs. Seibold, to wit:

> "Q. Now, please, ma'am, I don't want you to go into any of the details that happened at the McCann's but after supper did anything happen with Eddie?
>
> "A. Yes. The McCann's left and Eddie and I were there by ourselves. The minute the McCann's walked out of the house, Eddie started screaming at me and said that I had come to Auburn to help him but that I had done everything but what he wanted me to do, which was to go to Mrs. Sinclair and beg her on my knees to allow him to visit Cathey at the Sinclair home. And I told him that I could not do this.
>
> "Q. What did he do then?

"A. He threw a nut at my eye and hit my eye hard enough to sting it.

"A. Did you have your glasses on at that time?

"Q. Yes, I did, but it hit my eye none the less.

"Q. Then, what else happened?

"A. Well, he continued screaming at me in a very loud voice; and I said, 'Eddie, I will not talk to you any more about this. I will just walk back to the motel myself.' And I went out in the driveway and Eddie got in his Volkswagen and drove it at me, trying to run me down.

"MR. YOUNG: We object to 'trying to run me down.'

"THE COURT: Sustained. That is out, gentlemen, 'trying to run me down.' That calls for a conclusion of the witness.

"MR. WALKER: We reserve an exception.

"Q. Would you merely describe which direction he drove the car?

"A. Eddie drove the car directly at me.

"MR. YOUNG: We object to that.

"THE COURT: Overruled.

"MR. YOUNG: On the same ground as the other, Your Honor, that he drove the car directly at her.

"THE COURT: Overruled to that, Mr. Young. Let's have a little recess here, Mr. Walker. Recess for a few minutes.

*    *    *    *    *    *

"Q. Mrs. Seibold, when we recessed you were talking about Eddie driving a car.

"A. Yes.

"Q. Would you tell me how fast he was driving?

"A. Well, he had just started the car in the driveway, so it wasn't very fast.

"Q. Were you in a car or were you on foot?

"A. I was on foot.

"Q. Now, how close to you did he come?

"A. I jumped behind a tree and I think he stopped short of the tree.

"Q. Then what did he do?

"A. He then backed the car up and went out of the driveway and started to turn the car around.

"Q. Where did he go?

"A. I don't know.

"Q. Did he leave the premises where you were?

"A. Yes."

*    *    *    *    *    *

■■■ It is settled in this state that a witness may not testify as to his own uncommunicated opinion, purpose, belief, or intent. Hardie v. State, 260 Ala. 75, 68 So.2d 35. An exception to the general rule was enunciated in Alabama Power Co. v. Edwards, 219 Ala. 162, 166, 121 So. 543, 546, in the case of *fear*, as follows:

" * * * And it has been frequently held here that a witness may not speak of his uncommunicated opinion, belief, purpose, or intent. To that rule there seems to be no valid objection. But we think a witness may say that he was hot, or sick, or had a pain—physical facts. The answer in this case evidenced a compound of physical and mental states. The reflex or involuntary physical manifestations of fear are well known. * * * We see no controlling reason why the plaintiff should not have been allowed to say that she was 'scared.' * * *"

In Ingram v. State, 252 Ala. 497, 500, 42 So.2d 36, 38, we further stated as follows:

"* * * In the McGuff case, supra [248 Ala. 259, 27 So.2d 241], we fully recognized what was said in the Edwards case, supra [219 Ala. 162(13), 121 So. 543], about the method of proving the physical status of fear and the legal right to prove fear by the witness on direct examination *when it is material. * * *"* (Emphasis added.)

▇ In the case under review, substantial testimony of expert and lay witnesses directed to the defendant's plea of not guilty by reason of insanity was received in evidence. That being so, following the reasoning of this Court in Ingram v. State, supra, Mrs. Seibold's answer to the question propounded was material to the issue of the defendant's insanity and was admissible.

▇ Mrs. Seibold testified at length and in detail to disputes, quarrels and antagonisms between herself and her son, and of her efforts to have him institutionalized. This testimony, coupled with the son's driving the automobile toward her, clearly showed that she had every right to stand in fear of the defendant. We cannot see that the defendant was probably injured in any substantial right merely by the sustention of the objection as to whether she was in fear at the time of the automobile incident. While we feel that Supreme Court Rule 45, Title 7, Appendix, Code 1940, Recompiled in 1958, is to be applied with great caution in capital cases, we see no reason why it should not be applied in a capital case where it is obvious that a defendant could not have probably been injured in a substantial right by a ruling.

During the cross-examination of Cathey Sinclair, a witness for the State, the following exchange transpired:

"Q. Did you write any letters at all to him during that period of time?

"MR. YOUNG: If the Court please, I can't see what this witness wrote to him would have—

"THE COURT: Sustained. If she wrote any letters to him, you ought to have the letters. The letters are the best evidence anyway.

"MR. WALKER: We reserve an exception. May it please the Court, in view of Your Honor's remark that we ought to have the letters, of course, we realize that these things do get destroyed and this is the reason we are asking if she did write such a letter.

"THE COURT: Wouldn't your client know whether she wrote the letters or not? All right, did you write any letters?"

▇ The witness was allowed to answer the question and, in fact, the matter was treated extensively in subsequent testimony of the witness. We see no prejudice in the comment of the court complained of by the defendant.

The defendant assigns error resulting from the following exchange during the cross-examination of Faye Sinclair, a witness for the State:

"Q. Now, I am directing your attention to the summer of 1967, did you take a chemistry course last summer?

"A. Yes, sir.

"MR. YOUNG: And we object to that as completely immaterial.

"MR. WALKER: Well, I am going to direct it to something Eddie Seibold did.

"THE COURT: Overruled.

"Q. Where did you have the class?

"A. The Commons Building, Auburn University.

"Q. Now, do you remember Eddie Seibold coming to your chemistry classroom one day before or after class had

started and having a conversation with you?

"A. Well, what it was, the chemistry class had a lab and this was the first lab they had had and I didn't know they were going to have it so I went on to class and there was no one there and Eddie came by and told me where they were going to have it. And he came in and talked to me.

"Q. On that occasion, did he ask you this, or this in substance, 'Do you think I am nuts?'

"A. No.

"Q. He did not ask you that?

"A. Not then.

"Q. Did he ask you that on some other occasion?

"A. Last summer, the summer before last, he asked me once, he thought, if I felt he was crazy.

"Q. And what did you tell him?

"MR. YOUNG: We object to what she answered.

"THE COURT: Sustained.

"MR. WALKER: Reserve an exception."

\*   \*   \*   \*   \*   \*

The witness' testimony is, in the first place, confusing. The trial was conducted in January, 1968. "Last summer" would have been in 1967; "the summer before last" would have been in 1966. Defense counsel had directed the witness' attention to the summer of 1967 and apparently that is the time at which the defendant asked the witness the alleged question.

The answer sought by the above question was either the opinion of the witness as to the accused's mental condition, or a mere statement of fact, i. e., what she had replied. If viewed as seeking Faye's opinion as to the accused's mental condition, the question was faulty in that no

proper predicate had been established to permit a lay witness' opinion as to mental condition. To authorize a nonexpert witness to give his opinion of the existence of an unsound condition of mind, he must not only have opportunity to form a judgment, the facts on which such judgment is based must be stated. Jones v. Jones, 275 Ala. 678, 158 So.2d 481; Haghart v. Cooley, 278 Ala. 354, 178 So.2d 226. If viewed as calling merely for a statement of fact, i. e., her answer to the defendant's question at the time of the conversation, to have allowed the answer would in effect have permitted evidence by indirection which could not have been shown directly. The ruling of the trial court on this point was not improper.

Counsel for defendant contends that error resulted from the following ruling by the court in relation to whether Cathey had told the defendant he should see a psychiatrist:

"Q. Did this, however, his continuing to write you at this time and the things he was saying to you at this time, did they not create in your mind the impression that there was something that ought to be done for Eddie, because of his mental state as revealed by the letters?

"MR. YOUNG: If the Court please, he asked this witness the identical question on this other cross-examination.

"THE COURT: Sustained.

"MR. WALKER: And we respectfully reserve an exception to Your Honor's ruling.

"Q. Were not those letters and the other things that Eddie had been saying and doing at that time the reason that you reached the opinion that he should see a psychiatrist?

"MR. YOUNG: We object to that.

"THE COURT: Sustained.

"MR. WALKER: We reserve an exception.

"Q. Did you so advise Eddie that he should see a psychiatrist?

"MR. YOUNG: We object to that, this is *repetitious*. (Italicizing ours.)

"THE COURT: Sustained.

"MR. WALKER: We reserve an exception."

\*　　\*　　\*　　\*　　\*　　\*

The following excerpts are taken from the record of the previous testimony of Cathey Sinclair, on cross-examination, at the time she first appeared as a witness:

"Q. Let's go back then to the time that you do remember, which was the time he called you in late October, the first time.

"A. Yes.

"Q. Did you tell Eddie Seibold on that occasion that he ought to go to a psychiatrist or psychologist?

"A. I don't remember.

"Q. Did you tell him that you were going to one the very next day, because you had to talk to somebody about that situation?

"A. I don't remember if I said that or not.

"Q. You probably did say it and don't remember, or you just don't know for sure?

"A. Now, I can't agree to that. I cannot remember.

"Q. You would not deny that you did say it.

"THE COURT: Mr. Walker, she said she could not remember."

\*　　\*　　\*　　\*　　\*　　\*

"Q. During this period of time, in any of those telephone conversations or letters, either one, did you tell Eddie Seibold to go to a psychiatrist?

"A. I cannot remember specifically telling him.

"Q. Do you remember that you had a conversation in which you suggested that he go to a psychiatrist and he said that he would go only if you went with him?

"A. I found that on my campus, psychiatrists were about the only persons you could talk to privately and get adult advice from without feeling that you were damaging your record, because at my school, meeting with psychiatrists are completely private and are never recorded. And I do remember suggesting that perhaps, since I did feel that psychiatrists were people that you could talk to privately, that it might be advisable for him to go, only since I felt that he needed to talk to someone, because lots of times I feel that I need to talk to someone about school or work or other things."

\*　　\*　　\*　　\*　　\*　　\*

The State's objection to the question propounded by defense counsel, based on its being repetitive, was quite properly sustained.

The defendant further complains of several instances during the progress of the trial in which the court made allegedly disparaging remarks about the defendant's case such as to require a reversal on review.

The following took place during the cross-examination of Dr. Bernard Breyer, a professor of English at Auburn University, appearing as a witness for the State:

"Q. In brief, is that not a poem written in the same style as Lord Byron—

"THE COURT: Sustained. If you will just object, I will sustain it,—

"MR. WRIGHT: We object, Your Honor.

"THE COURT:—but you just sit there. You did object, didn't you?

"MR. WRIGHT: Yes, sir.

"THE COURT: All right, sustained.

"MR. WALKER: May it please the Court, we respectfully except to the Court telling the State how to run the State's case.

"MR. YOUNG: He objected at the same time you said something, Judge.

"THE COURT: Sustained. Go ahead.

"MR. WALKER: We respectfully except, Your Honor."

\*　　\*　　\*　　\*　　\*　　\*

▆▆ While it is not usual for courts to interfere and rule out evidence which counsel is willing to let in, yet if the evidence is irrelevant or immaterial, the court may rule it out of its own motion, and its ruling furnishes no ground for reversal. Durrett v. State, 62 Ala 434; Rogers v. State, 36 Ala.App. 602, 61 So.2d 249.

▆▆ During the cross-examination of Cathey Sinclair, the trial judge stated as follows: "At least to insanity. Some of the questions you are asking her, I can't conceive, to save my life, what bearing they have on the question of insanity." It is the court's duty to confine the evidence to the points in issue in order that the attention of the jury may not be distracted, or that their minds may not be withdrawn from the main issue and directed to matters which are foreign or of questionable or doubtful relevancy. Jones v. State, 17 Ala. App. 394, 85 So. 830.

At another point in the cross-examination of the same witness, the following exchange took place between the court and defense counsel:

"MR. WALKER: In view of the Court's ruling, based on the case cited by Your Honor, I do not think it would be proper for me at this time to continue with cross-examination of Miss Cathey designed to bring out facts which I think tend to show insanity. This will be the nature of the rest of my cross-examination.

"THE COURT: Well, you haven't yet shown any insanity.

"MR. WALKER: Of course, I haven't put on my testimony.

"THE COURT: Yes, I know.

"MR. WALKER: I would like that she be retained as a witness until the trial is over, so I may, if I desire, recall her for this purpose.

"THE COURT: Well, she is retained as a witness and the Court is going to stop right there."

\*　　\*　　\*　　\*　　\*　　\*

▆▆ There is no error in the court's statement that the defense had shown no insanity. Defense counsel took no exception to the remarks of the court and, by implication, agreed that no insanity had been shown at that point. He should not be heard to complain now. The court does not invade the province of the jury in a criminal prosecution by stating that there is or is not evidence of particular facts when such is the case. Section 270, Title 7, Code 1940, Recompiled in 1958; Breedwell v. State, 38 Ala.App. 620, 90 So.2d 845.

In support of the contention that the lower court erred in various instances by making disparaging remarks about the defendant's case, defendant cites Haithcock v. State, 23 Ala.App. 460, 126 So. 890, where the Court of Appeals stated as follows:

"In Griffin v. State, 90 Ala. 596, 8 So. 670, and quoted with approval in Moulton v. State, 199 Ala. 411–416, 74 So. 454, 456, the court said: 'Any statement made by the court, however unintentional, made in the presence of the jury, cal-

culated to control the jury in its consideration of the weight to be given to testimony, will work a reversal, unless it be clearly shown that such remarks have been explained and excluded from them. It may be thought that the criticism of the court is too restricted and technical; but the principle involved is of such paramount importance it would be dangerous to permit the least infringement of the rule to pass without correction. * * *'" Id., at 463, 126 So., at 893.

Our view in the instant case is consonant with that expressed in Haithcock v. State, supra. An examination of the entire record fails to indicate that the remarks complained of by the defendant were, in any sense, "calculated to control the jury in its consideration of the weight to be given to testimony." Quite to the contrary, we are to the conclusion that the remarks of the trial judge were made in the interest of a trial free from prejudice to the rights of the defendant. What we said in Doss v. State, 224 Ala. 90, 93, 139 So. 290, 292, is applicable here:

"The language of the trial judge, exception to which forms the basis for assignment 27, was merely upon the question of expediting the trial of the cause and in no manner calculated to control the jury in its consideration of the weight to be given the evidence, as was the matter treated in Haithcock v. State, * * * No error here appears."

The lower court refused to allow the defendant to introduce into evidence the birth certificate of the defendant's father. Dr. Seibold, who allegedly had the birth certificate in his custody at the time he was a witness, testified that his full name was Herman Rudolph Seibold; that he was the father of the defendant; that he had never been known by the name "Strouthy"; and that he was born in Philadelphia, Pennsylvania, on August 30, 1908. It was following this testimony that the defendant sought to introduce the birth certificate, to which the State's objection was sustained.

Several witnesses offered testimony to the effect that the defendant had, at various times, stated that his father was an illegitimate German immigrant who had settled in Philadelphia. There was further testimony to the effect that the defendant believed that his father had the name "Strouthy" appearing on his, the father's, birth certificate and that the defendant had expressed a desire to have his own name changed to "Strouthy." It is not clear what purpose the defense had in mind in seeking to introduce the birth certificate into evidence, as the contents thereof are not revealed in the record. This Court cannot review rulings in respect to written instruments which are not in the record. Woodall v. Malone-Harrison Motor Co., 219 Ala. 366, 122 So. 357.

During the examination of defendant's witness, Colonel Compton, the recorder of the City of Auburn, the following question was asked on direct examination:

"Q. Colonel Compton, on Sunday, the 16th day of July, 1967, tell me whether or not Mrs. Herman Seibold, the mother of Eddie Seibold, came to you and in your capacity as the recorder of the City Court of the City of Auburn, Alabama, swore out a warrant, an affidavit, against her own son, Eddie Seibold, and charging him with something and asking for his arrest?"

The objection to the question was sustained. During the direct examination of the defendant's mother, the following questions were asked and objections to each sustained:

"Q. What efforts did you do about getting Eddie committed?

*    *    *    *    *    *

"Q. Mrs. Seibold, state whether or not you were successful in your efforts to get Eddie Seibold committed to an institution at that time?"

Appellant argues that the defense had as much right to show by its witnesses that the mother of defendant did take steps

to get him committed to an institution as the State had to ask the questions on cross-examination as provided in Jones v. The State, 181 Ala. 63, 61 So. 434. We agree that where, as here, the plea is not guilty by reason of insanity, the relatives of the defendant should be allowed to show that they did try to get him committed to an institution. We think the trial court erred in sustaining the objections to the questions addressed to Mrs. Seibold.

■ We do not think the court erred in sustaining the objection to the question directed to Colonel Compton because it lacks specificity as to commitment. The mere fact that defendant was "charged with something" was irrelevant to the charge on the pleas here. There was nothing to show ·a connection between the seeking of a warrant for the defendant and an attempt to have him committed for insanity.

■ Further, a defendant in a murder prosecution cannot complain of a ruling by the court refusing to permit a witness to answer a question when the court thereafter permitted the same witness to answer substantially the same question. Stephens v. State, 250 Ala. 123, 33 So.2d 245; 7 Ala.Digest, Criminal Law, ⚮1170(4). See Doughty v. State, 228 Ala. 568, 154 So. 778, and Deloney v. State, 225 Ala. 65, 142 So. 432, where the questions dealt with the mental condition of the defendant under a plea of not guilty by reason of insanity.

Mrs. Seibold closed her direct examination by saying that her son "was definitely of unsound mind." The following then occurred:

"CROSS EXAMINATION

"BY MR. YOUNG:

"Q. Mrs. Seibold, I am asking you, if you were of the opinion, why you didn't do something about it?

"A. I explained to you this morning I tried to have him committed. I tried, I tried. I went to six or seven people in Auburn and tried to have him committed. I tried.

"Q. But you didn't?

"A. I did not, the doctor refused to sign a certificate.

"Q. Mrs. Seibold, I know it is hard on you, and I don't mean to be disrespectful, please, ma'am. And I certainly hope that you understand that. I have just got a job to do; but in considering what you have described as your son's conduct, don't you think, actually think—

"THE COURT: Mr. Young, I can't hear you.

"Q. I said, in consideration of what she has described as her son's conduct, do you think you took the proper measures under those circumstances?

"A. I went to the dean of men, I went to a lawyer, I went to the police, I went to your head of the mental clinic here in Opelika, and not one of those people would do anything except the psychiatrist told me, 'Go home, you are not good for Eddie.' And he told me that Eddie was neither homicidal nor suicidal after I told him how he had threatened these people."

This testimony of Mrs. Seibold was much fuller and covered more instances than the defendant had sought to raise on direct examination and any error in excluding the prior evidence was cured by Mrs. Seibold's testimony on cross-examination.

The defendant's motion for a new trial, assigning forty-two grounds of error, was filed on February 19, 1968. The court, after several continuances, heard the motion on June 26, 1968. Immediately prior to said hearing, the defendant filed an "Amendment to Motion for New Trial," assigning two additional grounds of error based upon the decision rendered on June 3, 1968, by the Supreme Court of the

United States in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

██ The trial court refused to consider the "Amendment to Motion for New Trial," basing its action on the fact that said motion was filed more than thirty days after the date of final judgment. Neither of the grounds assigned in the later motion were germane to those assigned in the original motion for a new trial. This action was proper. See Southern Railway Co. v. McCamy, 270 Ala. 510, 120 So.2d 695; Burton v. State, 40 Ala. App. 146, 109 So.2d 311.

██ The affidavits filed in support of the "Amendment to Motion for New Trial" indicate that, upon the trial court's qualification of the jury venire by asking whether or not any of them were opposed to capital punishment, three or four jurors raised their hands to indicate an affirmative answer. The trial court thereupon directed the clerk of the court to remove from the jury venire the names of those jurors who had raised their hands. As stated supra, the lower court refused to consider the amendment containing the two grounds directed to the trial court's action in this respect. However, said amendment and affidavits are bound in the transcript, within the clerk's seal. Under Section 389, Title 15, Code 1940, Recompiled in 1958, it is the duty of this Court in a case of this nature to consider all questions apparent on the record and render such judgment as the law demands. On that basis, we direct our attention to the "Amendment to Motion for New Trial," and the affidavits filed in suppo-t thereof.

In Witherspoon v. Illinois, supra, the Supreme Court of the United States held that "* * * a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause imply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." The court further held that the decision

was to receive retroactive application in footnote 22 to the opinion.

In *Witherspoon,* supra, at the petitioner's trial the prosecution had eliminated forty-seven prospective jurors by challenging them under the Illinois statute in effect at that time, which provided as follows:

"In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same."

The Alabama statute under which the jurors were challenged for cause in the instant case, Section 57, Title 30, Code 1940, Recompiled in 1958, provides as follows:

"On the trial for any offense which may be punished capitally, * * * it is a good cause of challenge by the state that the person has a fixed opinion against capital or penitentiary punishments, * * *."

In Boulden v. Holman, Warden, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, the Supreme Court made it clear that no distinction could be drawn between the phrase "conscientious scruples against capital punishment," as used in the Illinois statute and considered in *Witherspoon,* supra, and the phrase "fixed opinion against capital * * * punishments," as used in our statute. See Jackson v. State, 285 Ala. 564, 234 So.2d 579.

██ It appearing from the affidavits filed in the case under review that three or four prospective jurors were excused simply because they indicated they were opposed to the death penalty, we are of opinion that the cause must be remanded for a further hearing in the court below. The hearing should be conducted expeditiously, with the defendant and his attorneys present. Those jurors who were excused upon challenge for having an opin-

**566**

ion against the death penalty are to be summoned and examined at said hearing.

As was true in Jackson v. State, supra, the "examination should be directed toward determining whether or not they could, in view of their affirmative answers as to having fixed opinions against capital punishment, nevertheless consider the evidence and instructions of the court and return a verdict of guilty although that verdict could result in a death penalty, if they, being the triers of fact were convinced of the guilt of the accused, and that the facts warranted a sentence of death." Id., at 586.

The lower court is further instructed that a full record be made of the hearing, a transcript of such testimony be made, together with the court's conclusion from the evidence adduced, and that a transcript of these proceedings under the seal of the clerk be promptly forwarded to this court.

Remanded for further proceedings in accordance with this opinion.

SIMPSON, HARWOOD, BLOODWORTH, MADDOX and McCALL, JJ., concur.

COLEMAN, J., concurs in result.

LAWSON, J., not participating.

MERRILL, J., not sitting.

### AFTER REMANDMENT

PER CURIAM.

Pursuant to our directions on remandment of this case, the lower court entered an order scheduling a hearing for July 28, 1970, the purpose of which was to consider the correctness of appellant's contention that certain veniremen had been eliminated as jurors on the basis that they had a "fixed opinion" against capital pun-

ishment, and that such exclusion violated the mandate of the United States Supreme Court set forth in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. The lower court further ordered that the appellant be transported to the Lee County, Alabama, jail and made available for said hearing.

The hearing was conducted in open court at the appointed time, with the appellant, his attorneys, and the assistant district attorney of Lee County in attendance.

Testimony taken at the hearing revealed that only one juror, Charles M. Allen, had been excused on the basis of a "fixed opinion" against capital punishment in the proceedings of January 15, 1968. The lower court first explained fully the purpose of the hearing. Then Mr. Allen, who was present in response to a subpoena, was questioned by the court in phraseology essentially similar to that used by the United States Supreme Court in Witherspoon v. Illinois, supra; Boulden v. Holman, Warden, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, 438, and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221. Counsel for appellant was then permitted to examine Mr. Allen at length.

The transcript of testimony taken at the hearing tends to show conclusively that the excused juror, Mr. Allen, would automatically have voted against the imposition of the death penalty by the jury no matter what facts the trial of the cause might have revealed. Mr. Allen further indicated in response to questioning that he would have been irrevocably committed to vote against the imposition of the death penalty before the trial began and would have "locked the case up," had he served as a juror.

In *Witherspoon*, supra, 391 U.S. at 522, 88 S.Ct. at 1777, the United States Supreme Court stated:

"* * * that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by

a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, * * *."

We conclude that the evidence shown by the transcript of testimony taken at the hearing shows unequivocally that Mr. Allen was properly excused under the rule of *Witherspoon,* supra.

In brief, appellant contends that the lower court erred in conducting the examination of Mr. Allen itself, and in asking "numerous leading questions." We disagree. The questions asked Mr. Allen by the lower court were phrased in such a manner as to precisely determine the subject's position on the question of the imposition of the death penalty. Further, at the conclusion of the lower court's examination, defense counsel was permitted to, and did, examine Mr. Allen at length.

The testimony taken on remandment, in compliance with the instructions of this Court, shows that there was no error in excusing juror Allen for cause.

The judgment is therefore due to be, and is, affirmed.

Affirmed.

All the Justices concur except LIVINGSTON, C. J., not sitting.

### ON REHEARING

Application for rehearing overruled.

SIMPSON, MERRILL, COLEMAN, HARWOOD, BLOODWORTH, MADDOX and McCALL, JJ., concur.

HEFLIN, C. J., and LAWSON, J., dissenting.

HEFLIN, Chief Justice (dissenting):

I must respectfully dissent. I feel the defendant was denied his constitutional right to have a hearing to determine his mental competency to stand trial. The principle has long been recognized that an accused should not be tried for an offense if he is, at the time of the trial, insane. In fact, Blackstone in 4 Blackstone's Commentaries 24, sets out,

"* * *

"Also, if a man in his sound memory commits a capital offence, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how he can he make his defence? * *"

In a note in 81 Harvard L. Rev. 454 (1967) entitled, Incompetency To Stand Trial, the author wrote, "The common law provided, as a matter of fairness and humanity, that a person could not be criminally tried if unable, because of mental or physical disability, to understand the nature of the proceedings against him or to act rationally in his own defense."

This Court in Ex parte Lee, 248 Ala. 246, 249, 27 So.2d 147, 149, stated:

"Insanity existing at the time of the commission of an alleged criminal offense, when properly pleaded and proven, is a complete defense to an indictment charging that offense. Section 423, Title 15, Code of 1940. But insanity occurring subsequent to the commission of the alleged offense is no answer to an indictment charging that offense, and cannot be made the basis of a plea in bar of the prosecution. Jones v. State, 13 Ala. 153. *But this is not to say that the defendant charged with a criminal offense, and who becomes insane after the commission of the alleged offense cannot suspend or postpone the trial of*

*his case until his sanity has been restored."* (Emphasis supplied)

Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956) held that conviction of an accused person in a federal court while he is legally incompetent violates due process. In Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, for the purpose of "resolving the difficult questions of state-federal relations", the United States Supreme Court made it clear that if a "sufficient doubt" as to the present competency of an accused is made known to the trial court, then the defendant is constitutionally entitled to a hearing on the issue of his competency to stand trial. In that case the accused before the trial had not requested a hearing on his mental competency to stand trial. However, throughout the trial the counsel for the defendant insisted that Robinson's present sanity was very much in issue; thus the Supreme Court held that sufficient notice was before the trial court to require it to have had a separate hearing concerning defendant's competency to stand trial. The two dissenters to that opinion, Justices Harlan and Black, while mainly disagreeing with the majority on the evaluation of the factual issue, expressed themselves in Justice Harlan's language as follows:

> "The Court appears to hold that a defendant's present incompetence may become sufficiently manifest during a trial that it denies him due process for the trial court to fail to conduct a hearing on that question on its own initiative. I do not dissent from this very general proposition, and I agree also that such an error is not 'waived' by failure to raise it and that it may entitle the defendant to a new trial without further proof. * * *" Id., at 388, 86 S.Ct. at 843.

It is clear from the dissenting opinion as well as from the majority opinion in that case that all nine of the members of the United States Supreme Court agreed that upon sufficient doubt being raised as to the mental competency of a defendant to stand trial that he is entitled to have a separate hearing to determine whether or not he should stand trial under his present mental condition.

Article 2 of Chapter 21 of Title 15 of the Code of Alabama 1940, deals with the matter of sanity inquisitions and proceedings in regard to those charged with crimes. The two pertinent sections pertaining to the case under review are Sections 425 and 426 of Title 15 of the Code of Alabama 1940. Under Section 425, supra, (the pertinent part of which is quoted in the majority opinion) the hearing is for the purpose of allowing the trial court judge to determine whether or not the defendant should be sent to the Alabama State Hospital for the purpose of getting the Superintendent of the Alabama State Hospital and two members of his medical staff to constitute a commission on lunacy with the view of determining the mental condition of such defendant and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime. It is clear that this section does not call upon the trial judge to make a determination pertaining to his mental competency to stand trial.

In Lee v. State of Alabama, 386 F.2d 97, 106 (5th Cir. 1967), the United States Court of Appeals for the Fifth Circuit commented on said Section 425 as follows:

"* * *

"As has been pointed out above, immediately following Lee's indictment the appropriate public officials moved under Sec. 425 to have an inquiry into his mental condition 'and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime.' Although this section speaks of the 'mental condition' of the accused it seems clearly directed towards the specific inquiry whether an indicted person suffered from any mental disease or defect which

would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime. It is plain that this section does not expressly require any determination by the lunacy commission as to the mental capacity of the accused person, already under indictment in a capital case, to stand trial."

Thus a hearing under said Section 425 fails to meet the requirements of the hearing to determine the mental competency of a defendant to stand trial as mentioned in Pate v. Robinson, supra.[1]

Section 426, supra,[2] provides for determination *by a jury* of the present sanity of a person charged with a felony, if he is held in confinement under indictment. A hearing under this section has been held to be a compliance with the requirement of Pate v. Robinson, supra, by the United States Court of Appeals, Fifth Circuit, in the case of Lee v. State of Alabama, supra.

In the instant case, a number of motions pertaining to the mental condition of the defendant were filed. However, all of these motions were filed under said Section 425 with the exception of the "Motion for Inquiry Into Mental Condition of Defendant Before Trial" and a plea in abatement. The said "Motion for Inquiry Into Mental Condition of Defendant Before Trial" and the plea in abatement clearly reflect that the defendant sought a determination of his competency to stand trial by a jury under said Section 426.

In the majority opinion it is stated that a "Second Motion for Investigation of Sanity of Defendant" was filed pursuant to the provisions of Section 426, supra. This is just not a correct statement. Nowhere in said motion does Section 426 appear. The following portion of the prayer of said motion clearly shows that the relief sought was under said Section 425:

"B. That upon the hearing of this motion the Court appoint three reputable specialist practitioners in mental and nervous diseases to examine the said defendant and to make their written report to this Court of his sanity or insanity, or in the alternative that this Honorable

---

1. It should be noted that Lee v. State of Alabama, supra, held that a hearing under Section 428 of Title 15 of the Code of Alabama 1940 is not directed to the ability of the accused to stand trial at all but is directed to the question of whether an accused should be sent to the State hospital for treatment. In support of its holding, the United States Court of Appeals, Fifth Circuit, in *Lee* states that the Alabama Supreme Court has described the purpose of that said Section 428 in Ex parte Garrett, 262 Ala. 25, 76 So.2d 681, by the following language:
"As we view the statute and as seems to have been the import of the Trice decision, it is the product of society's humanitarian attitude toward a person in confinement and if in such condition and the person is mentally sick, its beneficent purpose is to provide machinery whereby he may be transferred to a hospital rather than remain in jail."

2. Section 426 of Title 15, Code of Alabama, as pertinent, is as follows:
"§ 426 (4575) (7178) (4941) *Inquisition in certain cases of felony; proceed-* *ings.*—If any person charged with any felony be held in confinement under indictment, and the trial court shall have reasonable ground to doubt his sanity, the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity, such jury to be impaneled from the regular jurors in attendance for the week or from a special venire, as the court may direct. If the jury shall find the accused sane at the time of their verdict, they shall make no other inquiry, and the trial in chief shall proceed. If they find that he is insane at that time, the court shall make an order committing him to the Alabama state hospitals, where he must remain until he is restored to his right mind. When the superintendent of the hospitals shall be of opinion that such person is so restored he shall forthwith, in writing, inform the judge and sheriff of such court of the fact, whereupon such person must be remanded to prison on an order of such judge, and the criminal proceedings resumed. In no event shall such person be set at large so long as such prosecution is pending, or so long as he continues to be insane."

Court accept the aforesaid three affidavits attached to this motion as the written reports of three reputable specialist practitioners in mental and nervous diseases as called for under the provisions of Section 425, Title 15, Code of Alabama, Recompiled 1958.

"C. That upon the consideration of the aforesaid written reports an order be made and entered by this Honorable Court that the said defendant, Edward Albert Seibold, be delivered by the Sheriff of this County to the Superintendent of the Alabama State Hospitals for the purpose of determining the present mental condition of the said defendant and the making of a report to this Court thereon as called for by the provisions of the aforesaid Section 425, Title 15, Code of Alabama, Recompiled 1958."

The only ore tenus hearing that the trial judge held in connection with the numerous motions was concerning said "Second Motion for Investigation of Sanity of Defendant". It is apparent from the statements made by the lower court judge during the hearing that he considered the hearing as being an inquiry pertaining to whether the defendant *should have an examination* as to his insanity (Section 425). The trial judge, on one occasion during the hearing on said "Second Motion for Investigation of Sanity of Defendant", stated:

"* * * This motion is for the court to read the affidavits, listen to the testimony to determine whether or not this man requires an examination as to his insanity * * *."

The majority opinion seems to hold that since a hearing or "hearings" were held by the trial court then such suffices to meet the requirement of Pate v. Robinson, supra. The majority opinion construes a hearing as including a proceeding in which the trial judge considered a motion and the exhibits thereto. In fact, the majority holds that they find no constitutional infirmity in the hearings accorded the defendant on the respective motions filed in the case under review. I cannot agree that any so-called hearing in the case under review complied with the requirement of Pate v. Robinson, supra. All of the motions were specifically made under either Section 425 or Section 426. The plea in abatement sought a jury determination under the provisions of said Section 426. As has been heretofore pointed out a hearing under Section 425 fails to comply with said constitutional requirement. Clearly, no hearing was held under Section 426 because a jury determination was not made as is required by Section 426. At the utmost any so-called hearing could be, solely and only, construed as a hearing to determine if "sufficient doubt" existed as to the mental competency of the defendant to stand trial. No hearing was held to ascertain whether the defendant possessed the necessary and requisite mental competency to stand trial.

The "Motion for Inquiry into Mental Condition of Defendant Before Trial" had attached thereto as exhibits, an affidavit from Dr. Charles E. Herlihy, psychiatrist of Birmingham; an affidavit from another psychiatrist by the name of Dr. Charles H. Smith; and a third affidavit from Dr. Hugh Waldheim, Jr., psychiatrist of Miami, Florida. Said motion also averred under oath that the defendant had been examined by Dr. Ronald Hamby, a practicing clinical psychologist at Jackson Hospital in Montgomery and recited that it was the opinion of the said Dr. Hamby that the defendant was then of unsound mind, psychotic, and paranoid. All of the other motions had the identical affidavit of Dr. Herlihy, as well as further documentary testimony attached thereto as exhibits. The "Second Motion for Investigation of Sanity of Defendant" had as exhibits the identical affidavits of Dr. Smith and Dr. Waldheim, as well as the affidavit of Dr. Herlihy. The court heard the oral testimony of Dr. Howard S. Weldon, a general practitioner and surgeon of Opelika, Alabama. There can be no doubt that considerable expert psychiatric evidence was presented to the trial judge.

The affidavit of Dr. Charles E. Herlihy recited that he had examined the defendant on December 26, 1967 (which was less than three weeks prior to the date the trial began) and concluded, after detailing many findings, that he thought Seibold was psychotic (insane in a legal sense) and should be committed to the appropriate mental hospital for further diagnostic procedures. He further stated that the patient was not then capable of competently assisting in the case pending against him and in layman's language the patient was of unsound mind.

Dr. Charles H. Smith, in his affidavit, set forth his findings and observations in detail from an examination on January 3, 1968, and concluded as follows:

"* * *

"In my professional opinion the patient is suffering from a schizophrenic reaction. In as much as he is suffering from a psychotic condition, it would be my opinion that he is deserving of a period of observation and treatment at the appropriate state hospital. In my opinion the patient's present disorganized state of thinking is such that in the event of trial he would not be able to adequately assist in his own defense. In layman's language, the patient is now of unsound mind."

The documentary evidence from Dr. Hugo Waldheim, Jr. stated that he had seen the defendant in the Dade County (Florida) Jail on December 9, 1967, for the purpose of making a psychiatric evaluation and from his interview it was his professional opinion that Mr. Seibold demonstrated evidence of a mental illness and was in need of a more extensive evaluation before a definitive diagnosis of his mental illness could be established.

Dr. Howard S. Weldon was called by the defendant. He testified he attended prisoners in Lee County jail; that he had observed Edward Albert Seibold in said jail on two occasions; that he did not give Seibold any psychiatric examination; that it would be impossible for him to say whether he was of sound or unsound mind but that he would recommend that he be placed in an institution to determine whether or not he was suffering from unsound mind.

This was all of the evidence before the trial judge, for the State presented no evidence. No one, not even a layman, testified that the defendant was competent to stand trial, or even expressed an opinion that the defendant was sane. While some of the experts felt that the defendant should be examined further before making their final determination, two psychiatrists stated that the defendant was insane and incapable of competently assisting in the case pending against him. Such testimony, in my opinion, generated "sufficient doubt" as to his mental competency to stand trial, and, therefore, he was entitled to have a determination by a jury of his mental competency under the provisions of said Section 426. A similar factual situation existed in a case cited in Pate v. Robinson, supra, i. e., Thomas v. Cunningham, 313 F.2d 934, C.C.A. 4, where undisputed evidence established a "prima facie" showing that the defendant was incompetent to stand trial. That case held the denial by the trial court of the defendant's motion for a determination of the defendant's competency to stand trial was so arbitrary as to constitute a denial of due process.

The trial judge in the case at bar refused and denied the "Motion for Inquiry into Mental Condition of Defendant Before Trial" and struck the plea in abatement, both of which sought a Section 426 jury hearing and determination. Because of such rulings, I would reverse.

It has long been the position of this Court that the decision whether to order a Section 426 hearing is discretionary with the trial judge. Granberry v. State, 184 Ala. 5, 63 So. 975; Whitfield v. State, 236 Ala. 312, 182 So. 42; Burns v. State, 246 Ala. 135, 19 So.2d 450; Ex parte Bush, 247 Ala. 351, 24 So.2d 353. In at least two cases, Rohn v. State, 186 Ala. 5, 65 So. 42,

and Whitfield v. State, supra, the exercise of discretion in the application of the provisions of Section 426, supra, was held as not being revisable on appeal, citing Granberry v. State, supra, in support thereof. While *Granberry* does state that the trial court has a discretion under Section 7178 of the Code of 1907 (predecessor of Section 426) as to granting a motion to execute an inquisition as to a defendant's mental status at the time of trial, no such restriction therein is found as is stated in Rohn v. State, supra, and Whitfield v. State, supra. In Burns v. State, supra, this Court held that the denial of a hearing under Section 426 was not reviewable on appeal in the absence of abuse of discretion and cited in support of this proposition *Granberry, Rohn* and *Whitfield*. Whether the trial court's denial of such a hearing is reviewable on an abuse of discretion or not revisable at all is in a state of confusion. However, no Alabama case has been found where a trial judge was reversed for denying such a hearing. But, regardless, the impact of Pate v. Robinson, supra, transcends all prior decisions of this Court on this point and, therefore, in my opinion, indirectly overrules all such decisions which may be in conflict with it. If sufficient doubt of the defendant's present mental competency is raised, then it is mandatory that there be a judicial hearing to determine his mental competency to stand trial. Such a hearing was not held in the instant case and, therefore, in my opinion, Pate v. Robinson, supra, requires that it be reversed.

I would also reverse for another reason. In the main trial, after Dr. Herlihy testified that the defendant had admitted to him the facts of the crime, the attorney for defendant asked Dr. Herlihy two questions, to which the trial court sustained the State's objections—reciting that in each instance the question was for the jury.

These two questions were:

"Q. Doctor, do you have an opinion as to whether the acts which he has related to you and for which he is on trial here were the result of a mental illness which this man was suffering from in September of 1967?

"Q. Doctor, in your opinion, based upon the events related to you by Eddie Seibold, do you have a judgment as to whether or not the acts of violence for which he is now on trial were the sole proximate result of the mental illness that he is now suffering from and that he was suffering from in September of 1967?"

In the majority opinion of this Court, it was held that the trial judge correctly sustained the objections as such questions called for answers which were invasive of the province of the jury. It was apparent that the defense counsel sought to frame these questions within the context of Parsons v. State, 81 Ala. 577, 2 So. 854. The majority of this Court rely on Boyle v. State, 229 Ala. 212, 154 So. 575. However, I do not feel that Boyle v. State, supra, is authority for withholding expert opinion testimony from the jury's consideration. The majority opinion quotes from that case, and the portion thereof that it emphasizes is as follows: " * * * In such case, it is for the jury to say whether such disease was the sole cause of the deed." However, this actually is in reference to the propriety of the trial judge's refusal to give the affirmative charge in favor of the defendant and does not pertain to an evidentiary ruling. I do not consider that said quoted portion or anything in *the Boyle case* as apropos to the said issue now under review. Indeed, a careful reading of *Boyle* discloses that psychiatrists who testified at that trial stated that in their opinion the defendant was insane, and that either he did not know the difference between right or wrong, or if he knew the difference, he was unable to prevent doing the act.

An expert's opinion upon an ultimate fact is not inadmissible on that account.

McElroy, The Law of Evidence in Alabama (2nd Edition) Vol. 1, Section 127.01 (4), Page 306. Opinion testimony of experts on subjects appropriate for expert testimony is admissible, even if it is in practical affirmation of a material issue in the case. Watson v. Hardaway-Covington Cotton Co., 223 Ala. 443, 137 So. 33. It is permissible for an expert to testify as an expert on matters which are within the issues to be determined by the jury, provided such matters are not of common knowledge. Colvin v. State, 247 Ala. 55, 22 So.2d 548; Elkins v. State, 250 Ala. 672, 35 So.2d 693. In Birmingham Electric Co. v. Farmer, 251 Ala. 148, 151, 36 So.2d 343, this principle is stated as follows:

" 'Opinion evidence of experts, such as physicians, may be based upon facts of which the witness has actual knowledge, as well as upon abstract hypothesis.' Louisville & N. R. R. Co. v. Stewart, 128 Ala. 313, 29 So. 562, 568. *Since he was an expert, there was nothing in his testimony or the question put to him which invaded the province of the jury.* Colvin v. State, 247 Ala. 55, 22 So.2d 548; Watson v. Hardaway-Covington Cotton Co., 223 Ala. 443, 137 So. 33." (Emphasis supplied)

See also Brandon v. Progress Distilling Co., 167 Ala. 365, 52 So. 640.

These holdings of this Court are in keeping with the modern trend. See 2 Underhill's Criminal Evidence, Section 307, 1970 Pocket Part, page 9, where the following appears:

"There seems to be a modern tendency, however, to permit experts to give their opinions upon ultimate issues whose final determination rests with the jury."

In Hall v. State, 248 Ala. 33, 26 So.2d 566, this Court held that it was error not to allow an expert's testimony concerning whether the mind of the accused was so defective as to destroy his power to choose between right and wrong and whether his free agency was destroyed to such an extent that he was incapable of avoiding the commission of the act charged at the time thereof.[3] This, of course, is an element of Parsons v. State, supra. Hall v. State, supra, lists the elements of the defense of not guilty by reason of insanity in the following language:

"We prefer to adhere to the rule announced in the Parsons case, Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am. Rep. 193, recently re-affirmed in Reedy v. State, 246 Ala. 363, 20 So.2d 528, which requires in insanity cases that the proof should show, that at the time of the commission of the crime the defendant was afflicted with a diseased mind to the extent: (1) He did not know right from wrong as applied to the particular act in question, or (2) if he did have such knowledge, he nevertheless, by reason of the duress of such mental disease had so far lost the power to select the right and to avoid doing the act in question as that his free agency was at the time destroyed, and (3) *that, at the same time, the crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely.*" (Emphasis supplied)

In the case under review the questions were directed toward an element of the defense of not guilty by reason of insanity, that being, "the crime was so connected with such mental disease, in relation of cause and effect, as to have been the product of it solely." Since this Court reversed in Hall v. State, supra, for the refusal to allow an expert to testify about one element of the defense of insanity, I can see *no reason to apply a different rule* to another such element. Thus, in my opinion, the trial judge committed reversi-

3. Pertaining to this ruling, the opinion in Hall v. State, supra, makes reference to the inquiry on page 95 of the transcript. An inspection of the original transcript confirms the summary statement contained in that opinion.

**574**

ble error in sustaining the State's objections to these questions.

Because of the reasons herein discussed, I must respectfully dissent.

LAWSON, J., concurs in that portion of the dissenting opinion dealing with the denial of the defendant's right to have a hearing to determine his mental competency to stand trial.