278 So.2d 751

**Carl James MONROE**

v.

**STATE.**

**4 Div. 94.**

Court of Criminal Appeals of Alabama.

May 29, 1973.

C. H. Erskine Smith, Birmingham, Terry Butts and Harry E. Lane, Elba, for appellant.

William J. Baxley, Atty. Gen., and Don C. Dickert, Asst. Atty. Gen., for the State.

ALMON, Judge.

This is an appeal from a judgment of conviction of murder in the first degree. Punishment was fixed at death by electrocution.

Shortly after midnight on September 4, 1970, an unidentified motorist notified the Brundidge Police Department that an automobile was parked alongside and partially on Alabama Highway 125 between Elba and Brundidge. State Trooper Don Morris and Brundidge Police Officer Robert Ross thereupon proceeded to the location of the abandoned 1961 green Rambler station wagon, recognized by Officer Ross as belonging to a man named James Hardin.

The officers observed the left front window of the automobile as having been shattered, with glass therefrom lying on the pavement and inside the car. The right front door was open. The left headlight was broken and there were blood spots on each front fender, the hood, and inside of the automobile. Red colored paint transfers were found on the hood of the green Rambler. The officers found broken glass and pieces of taillight lens a few feet in front of the automobile.

Officer Ross later left the scene on Highway 125 with Zeek Farmer, a friend of the decedent Linda Hardin. Officer Ross and Farmer had determined that the decedent had last driven the green Rambler. Ross and Farmer, who had driven to Brundidge in an effort to locate Miss Hardin, saw a 1961 Rambler station wagon (hereinafter referred to as the red Rambler) parked on a lot appurtenant to an apartment building, the red Rambler having a partially missing right taillight lens. They then examined the taillight assembly for a brief time and later returned to the scene of the green Rambler and gathered the broken taillight lens. Ross returned with Coffee County Sheriff H. D. Tillman, Brundidge Police Chief Joe Wallace, and Trooper Morris to the lot on which the red Rambler was parked. The officers compared the broken lens pieces with the intact portion of the lens and determined that the broken lens pieces came from the red Rambler. Sheriff Tillman detected blood on the tailgate of the red Rambler.

The defendant Monroe answered Chief Wallace's knock on the door of the apartment and agreed to talk with the officers upon being permitted to put on some clothes. This occurred somewhere around 5:30 or 5:45 A.M. on September 4, 1970. Sheriff Tillman asked Monroe who had been driving the red Rambler and Monroe replied that he had. Monroe then accompanied Wallace, Morris, and Tillman to the Brundidge Police Station. The red Rambler, which did not belong to Monroe, was driven to the station by Ross.

Monroe was read the warnings mandated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, by Sheriff Tillman, acknowledged his understanding thereof, and chose not to talk. The district attorney arrived at the station around 7:00 A.M., consulted with Sheriff Tillman about the evidence and advised that Monroe be formally arrested. A short while after he had been incarcerated, Monroe expressed a desire to talk with the district attorney. Monroe was released from the cell and allowed to make a telephone call following which he exclaimed to Sheriff Tillman and the district attorney that they had "better get an ambulance for her." Monroe was again apprised of his right to have a lawyer and advised by the district attorney that a lawyer could be procured within an hour or two whereupon Monroe replied that there wasn't enough time. Monroe then led the police officers to the site of Miss Hardin's body. When they arrived she was dead.

After the jury was struck, but before any proceedings began, the following occurred:

"MR. BUTTS: The defendant wishes to make a statement to the Court.

"THE COURT: To me.

"MR. BUTTS: We are informed the defendant wishes to make a statement. We have advised him as fully as we can advise him of all the ramifications of any statement that he might make. Whatever he says, whatever his decision is is entirely his and we are informed at this time that he wants to make a statement to the Court.

"MR. STEPHENS: In chambers.

"THE COURT: I am not going to receive a statement from this defendant in front of this jury before the trial commences or any time if he desires to take the witness stand. If he wants to talk in the presence of counsel in chambers in private in the record that's his business, but I don't want any misunderstanding. I don't know what is coming, but I will not entertain a statement from the defendant. He can speak through his counsel.

"MR. BUTTS: Let him make a statement that he made to us in chambers and we will see further where to go.

"(All of the above was out of the hearing of the jury.)

.    .    .    .    .    .

"THE COURT: The court reporter got what was made known to me by Mr. Butts, Mr. Monroe's attorney, outside that the defendant wanted to make a statement. Let me ask Mr. Butts, do you know what your client, Mr .Monroe, wants to say?

"MR. BUTTS: Yes, sir, we know the nature of the statement that Mr. Monroe makes. We don't know fully how to proceed, whether this was to be done out there or in here, but Mr. Monroe has informed us that he wants to make a spontaneous statement concerning his guilt or innocence in this case. We have fully advised Mr. Monroe as much as we can of the ramifications of any statement or statements that he may make, but it is our understanding based on what Mr. Monroe has told us that he wishes to make such a statement at this time concerning his guilt or innocence.

"THE COURT: Let me ask you before he starts talking, says anything. Is this from your understanding and advising your client is this in the nature of a plea or is it in the nature of what some folks call an admission if there be any distinguishing [sic].

"MR. BUTTS: May it please the Court, I am not sure what you would call it.

"THE COURT: Mr. Monroe, you have had competent counsel. They have been with you since September 4, I think the day they were appointed. I am sure they have advised with you. They have filed various motions for you. I am not the one to say you cannot make such a statement, whatever it may be. But I advise you of one thing that I want you to be voluntary in

whatever you say. I want you to clearly understand we are out of the presence of the Court and what good it may do or may not do we don't know. I mean it is highly out of the ordinary.

"MR. ROWE: (Mr. Lane's law partner) Out of the presence of the Court or out of the presence of the jury?

"THE COURT: Out of the presence of the jury. We are in chambers in an office with doors shut. Nobody in here but the District Attorney and defendant and counsel and court reporter and Judge. I don't have any idea how to get any more private. But I don't know what to do other than if the man wants to make a statement feel free to make one. I don't know what effect it will have on the trial. So I am here and Mr. Monroe after advice of counsel, whatever you want to do or however you want to proceed now.

"THE DEFENDANT: What I really wanted to do was change my plea from not guilty to guilty.

"THE COURT: Are you saying now in the presence of your lawyer that you want to withdraw your pleas of not guilty and not guilty by reason of insanity entered on arraignment and plead guilty to the indictment in which you are charged with the serious offense of Murder in the First Degree.

"THE DEFENDANT: Yes, sir.

"THE COURT: You understand that you don't have to do that, that the jury has been struck, they have been sworn, the issues are joined between you and the State on this indictment, the burden of proof is on the State to satisfy the jury of your guilt beyond a reasonable doubt to a moral certainty that you with premeditation, malice, wilfullness and deliberation did do what they allege you did, killed Linda Ann Harden by hitting her with a bottle or some other blunt instrument. You understand that, that you are presumed innocent at this time.

"THE DEFENDANT: Yes, sir, I understand I am presumed innocent. I know I am not required by law to plead not guilty or anything like that, but I feel I have to plead guilty because, well, I committed the crime. I didn't mean to do it. Still I did do it, and I don't feel that I can go out there and tell people that I did not do something that I really did do.

"THE COURT: You have talked to these lawyers about this situation have you not?

"THE DEFENDANT: Beg your pardon.

"THE COURT: Have you discussed with Mr. Butts and Mr. Lane the nature of what you are seeking to do?

"THE DEFENDANT: Yes, sir, I have talked to them about it and they said it was up to me to do it if I wanted to do it and that all I could do is hope for mercy of the Court and the jury.

"THE COURT: Well, you understand— I am trying to slow you down—that under the pleas of not guilty the rights to be afforded to you through the process, now, whether the process be the best in the world, but this is court in Coffee County, Alabama, you are entitled to this trial open to the public. You are entitled to be tried and have the issue of guilt and the degree if any of homicide you may be guilty of determined by this jury, whether it be murder one, murder two, manslaughter or manslaughter one. Those are the three degrees which may be embraced in that indictment. In other words, there are four degrees of homicide which may be embraced in that indictment. You understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: And the jury must determine which degree. Not only the guilt, but of what degree, if any, of homicide.

"THE DEFENDANT: Yes, sir.

"THE COURT: Then they have also got to fix the punishment—

"THE DEFENDANT: Yes, sir.

"THE COURT: As it now stands on this indictment. You have got the right to sit out there and participate in this trial, you have got a right to see and hear every witness that will be or has been subpoenaed and is used by the State against you. You know that right?

"THE DEFENDANT: Yes, sir.

"THE COURT: You have got a right to have through your counsel questions, cross examination of every witness that takes that stand?

"THE DEFENDANT: Yes, sir.

"THE COURT: You have the right and the privilege if the witnesses can be subpoenaed and found to have witnesses take the stand out there to swear in your behalf, whether it be alibi—now, don't get me wrong. I am just trying to show what you have the opportunity to do—to show alibi or you have a plea of not guilty by reason of insanity, to explore that plea to the fullest extent allowed under the law of evidence of Alabama. You have got a right to take the stand out there if you desire and give evidence of your past workings and all and to give evidence whatever it may be in your behalf relevent to the issues in this case. You understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: Or you have the right to remain silent, not take the witness stand, and it is my duty of the Court to charge the jury that it is the law of Alabama that it is no inference whatsoever of a man using his constitutional right to remain silent, not to take the stand and testify or where evidence may be elicited which may tend to incriminate him. You understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: Has anybody promised you anything?

"THE DEFENDANT: No, sir.

"THE COURT: I know you are not under the influence of any alcoholic drugs or stimulants.

"THE DEFENDANT: No, sir.

"THE COURT: I don't see how you could be, but you are all right? As far as you know, you are competent right now?

"THE DEFENDANT: Yes, sir.

"THE COURT: And you understand what you are seeking to do?

"THE DEFENDANT: Yes, sir.

"THE COURT: You understand if I permit you to change your pleas and you say I am guilty to this indictment and the charge embraced therein that in affect, not in affect, [sic] but you may be waiving some of these rights because you are admitting your guilt under this indictment?

"THE DEFENDANT: Yes, sir.

"THE COURT: Mr. Monroe, in the presence of your lawyers I make known to you now that under this charge that you are charged with if you plead guilty and I accept it, the jury in this courtroom is going to fix the punishment and determine the degree or what. You understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: That I have the authority, I think under this new statute passed, which is now Title 15, Section 277, in the Court's discretion to receive your plea and impose sentence of life, but I am not going to exercise that discretion. Also in that statute I am given the discretion to have the jury fix the punishment. Is that a fair statement of what that statute says?

"MR. LANE: Yes.

"THE COURT: So that's what will be the outcome of it if you decide and still want to plead guilty and I am convinced that it is voluntary on your part. Has anyone promised you or suggested to you that the jury would give you life if you plead guilty?

"THE DEFENDANT: No, sir.

"THE COURT: Has anyone connected with this court, whether it—well, anyone promised you favors to get you to say that you are guilty?

"THE DEFENDANT: No, sir.

"THE COURT: Has anyone promised to take care of your wife or threatened harm against any member of your family if you didn't plead guilty?

"THE DEFENDANT: No, sir.

"THE COURT: And you are saying to me as judge of the Court that is presiding in your case that you are freely, Carl James Monroe, voluntarily requesting me to allow you to plead guilty to the offense of Murder in the First Degree?

"THE DEFENDANT: Yes, sir.

"THE COURT: I am going to address these remarks to Mr. Butts and Mr. Lane. Have you all explained to him the maximum punishment that is involved in this, death or life imprisonment?

"MR. LANE: We have.

"THE COURT: Are you of the opinion that this defendant and your client understands the charge, the elements the nature of the burden of proof upon the State?

"MR. LANE: Yes, sir."

▇ As can be seen from the portion of the record above quoted, the trial judge went to great lengths to apprise the appellant of the nature and consequence of his act. We have not set out all of the record, for the sake of brevity. Suffice it to say the learned trial judge more than adequately complied with Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, before accepting the guilty plea. He went over each right in detail and further determined that there was a factual basis for the plea. He explained that the only two possible punishments were life and death at the discretion of the jury.

This case was properly laid before the jury and after arguments of counsel the jury returned a verdict of death.

▇ Prior to trial the appellant filed a petition asking the court to:

" . . . institute a careful investigation, call a responsible physician and other creditable witnesses, and if you deem necessary call a jury, and if upon such investigation you have reasonable grounds to believe that such defendant was insane either, at the time of the commission of such offense, or presently, that Your Honor forthwith order that such defendant be delivered by the Sheriff of the county to the Superintendent of the Alabama State Hospitals, who is charged with the duty of placing such defendant under the observation and examination of himself and two members of his medical staff to be named by him, constituting a commission on lunacy . . . "

In accordance with the above petition the court appointed Dr. L. Bancroft Cooper and Dr. J. M. Kimmey, licensed practicing physicians in the City of Elba, to observe the appellant and make a report to the court on whether in their opinion the appellant was insane either at the time of the commission of the alleged offense or presently. This matter was set for hearing and both Drs. Cooper and Kimmey testified that in their opinion appellant was sane at the time of the commission of the alleged offense and at the present time. No other testimony was offered by the State or the appellant at this hearing.

Therefore, there was no error in the trial judge's refusal to deliver the appellant to the Superintendent of the Alabama State Hospitals for further examination. Seibold v. State, 287 Ala. 549, 253 So.2d 302; Pace v. State, 284 Ala. 585, 226 So.2d 645; Aaron v. State, 271 Ala. 70, 122 So.2d 360.

Appellant was afforded a hearing as was contemplated in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

▇ The record discloses great caution of the trial court in questioning prospective

jurors with respect to their scruples against capital punishment. A thorough comparison with Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, persuades us that the mandate therein formulated does not apply to this case. The three prospective jurors challenged for cause on the ground that they opposed capital punishment answered that they were irrevocably committed to the abolition of capital punishment and would vote against the imposition of it, notwithstanding the evidence adduced at trial. Pretermitting a discussion of the impact of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, on *Witherspoon*, supra, we hold the trial court's conduct in this matter to be permissible within the purview of *Witherspoon*.

■ Tit. 15, § 267, Code of Alabama, 1940, recompiled 1958, compels us to review without any presumption of correctness the ruling of the trial court on the motion for change of venue. We conclude from examination of the record that defendant failed to show to the reasonable satisfaction of the trial court that there was such probable prejudice that he was unable to obtain a fair and impartial trial in the Circuit Court of Coffee County. Appellant introduced testimony from persons closely associated with various forms of news media, along with several newspaper clippings. This evidence, at most, tended to show the fact of news coverage. No evidence was introduced to show that this news coverage culminated in an atmosphere of bias.

■ Appellant filed pretrial motions to quash the indictment and to suppress evidence, the motions being predicated upon similar grounds. The record reveals no error in conjunction with the court's having ruled adversely to the appellant's position on these matters. The only incriminating statement made by the appellant during investigation and prior to the *Miranda* warning was his answer to the question, "Who was driving this car last night?" This question was propounded before the investigating officers knew that a crime had been committed and before there was any reason to suspect that the appellant had committed any crime and before appellant had been taken into custody. Appellant's incriminating conduct in directing the officers to the site of decedent's body followed more than one *Miranda* warning.

■ Even assuming, arguendo, that the trial court erred in ruling upon one or more of defendant's pretrial motions, we refuse to set aside the conviction. We maintain this position on the authority of Freeland v. State, 43 Ala.App. 406, 191 So.2d 245, which stands for the proposition that a voluntary guilty plea concludes the issue of guilt, and is not rendered ineffective by irregularities in prior proceedings. See Tollett v. Henderson, —— U.S. ——, 93 S.Ct. 1602, 36 L.Ed.2d 235.

■ Because of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, and Hubbard v. State, 290 Ala. 118, 274 So.2d 298, the sentence of death imposed on the appellant, Carl James Monroe, is vacated and set aside. In lieu thereof, the sentence is corrected to provide that the said Carl James Monroe be imprisoned in the State penitentiary for the term of his natural life. The Clerk of this Court shall furnish a certified copy of this order to the Clerk of the Circuit Court of Coffee County, and the clerk of that court shall issue a commitment in this case based upon this sentence of life imprisonment and shall forward the commitment to the Board of Corrections.

It follows that except as to the death sentence, the judgment of the circuit court is affirmed. With regard to the death sentence, the judgment of the circuit is modified and the sentence is reduced to life imprisonment, and as modified, the judgment is affirmed.

Modified and affirmed.

All the Judges concur.