John L. Jacobs was convicted of murder under Alabama's new Death Penalty Act committed during the course of the robbery of a seventy-nine year old man, and the jury returned a verdict fixing his punishment at death. *Page 430 
Prior to trial appellant filed a motion for a continuance and a motion for change of venue. Both motions alleged that this appellant could not get a fair and impartial trial in Blount County for the reason that the day before this case was set for trial appellant's brother had been tried, convicted and sentenced to death by a jury drawn from the same venire that appellant would be forced to strike from. These motions further alleged that the remaining veniremen from which a jury must be selected to try this appellant had knowledge that appellant's brother had been given the death penalty and the facts in both cases were similar.
It developed that after the jury was selected to try the case against Jerry Wayne Jacobs all the rest of the jurors were excused and were told not to come back to the courthouse for two days. When they returned for the trial of appellant's case, some of the veniremen heard talk around the courthouse that the jury in the first case had given that defendant the death penalty. However, a number of the prospective jurors had not heard the outcome of the first trial. At least 19 jurors out of the 56 left on the panel after the jury was struck in the first case did not know what the verdict was in the first case. Most of the other 37 jurors had heard that the Jerry Wayne Jacobs
case was over and some heard the jury gave him the death penalty and some heard he got life imprisonment.
The trial judge stated that he would reserve ruling on the motions until the jury had been qualified. Mr Rountree requested that he be permitted to voir dire the jury panel individually and separate and apart from the other jurors on the panel. This request was granted and each juror on the panel was called into an office next to the courtroom, and the trial judge told defense counsel they could ask the prospective jurors any questions they wanted to ask. The voir dire examination of the jury panel covered 141 pages of the transcript. All of the jurors on the panel stated under oath that they would go strictly by the evidence and those who were asked if this appellant could get a fair and impartial trial in Blount County answered in the affirmative.
At the conclusion of the voir dire examination counsel for appellant renewed his motion for a continuance and for a change of venue. No other evidence was offered on the motion for change of venue. Both motions were denied by the trial court and the case proceeded to trial with a struck jury.
This is the second death penalty case to reach this court since the Legislature of Alabama passed Act No. 213 in 1975 which became effective 180 days after its approval by the Governor on September 9, 1975. See the opinion released by this Court on July 26, 1977, in the case of Jacobs v. State, Ala.Cr.App., 361 So.2d 607, brother of this appellant.
What this Court said in the Jerry Wayne Jacobs case as to the constitutionality of Alabama's new death penalty law is hereby adopted by reference to that case.
Most of the facts and circumstances leading up to and culminating in the death of the deceased, Walter Robert Knight, were set forth in the opinion in the Jerry Wayne Jacobs case and will not be repeated here. Most of the issues raised in the present case were raised, treated and resolved in the JerryWayne case and will not be dealt with again in this case.
We will set forth the facts in the present case which show John L. Jacobs's involvement in the robbery and murder of Mr. Knight.
The facts in the record before us show that John L. Jacobs was the only one of the trio who was personally acquainted with the deceased. He had known Mr. Knight for several years and had on occasions played poker with him. He knew the deceased carried large sums of money on his person and he had discussed robbing him long prior to July 17, 1976, the date of the robbery and death of Mr. Knight.
Mr. Raymond Mack Brown testified that he was 20 years of age and lived on Route 8, Cullman, Alabama, and had known this appellant most of his life. He stated that *Page 431 
he got out of the service some time in April of 1976 and he and appellant hitchhiked to California and back. The round trip took 11 days. He said that during this trip appellant mentioned the name of the deceased several times and told him that Mr. Knight carried large sums of money and "how easy picking Mr. Knight would be to rob." He further testified that appellant talked about robbing Mr. Knight before they made the trip to California.
This witness further testified that he had known Mr. Knight about eight to ten years and had seen him in the Star Billiard Parlor on several occasions; that he and Mr. Knight both lived in Cullman, Alabama.
On cross-examination he stated that he knew Eugene Brown well but did not come into contact with him very often. He said he was distantly related to Eugene Brown and knew he was under indictment for murder involving the death of Mr. Knight.
Sherril Edward Brown testified that he lived at Simco, a community in Cullman County, Alabama, and had known appellant all of his life. He stated that he knew Mr. Walter Robert Knight during his lifetime and had known him for 20 years. He said that he was related to appellant by marriage explaining that his brother married appellant's sister.
Sherril Brown further testified that ten or 12 days before Mr. Knight was killed he and appellant went to Huntsville, Alabama, to drink beer at the Pendleton Club. He stated on that occasion appellant told him he was thinking about robbing Mr. Knight and previous to this trip to Huntsville, appellant had tried to borrow a gun from him. He said that on the way back from Huntsville appellant was still talking about robbing Mr. Knight and Mr. Brown told him that "Mr. Knight will shoot you." Appellant replied, "I can do it in a way that he won't do it. I can drop him in that water down there, and nobody will ever find him." It developed that the place appellant was referring to was an old rock quarry that was full of water and was near Blount Springs in Blount County.
On cross-examination this witness testified that the gun appellant tried to borrow from him was a .22 caliber pistol and was in the glove compartment of his car. He did not loan the pistol to appellant and stated that the gun was now in his home.
The only logical deduction that can be drawn from the testimony of the foregoing witnesses is that John L. Jacobs had planned to rob Mr. Knight long before July 17, 1976, the date Mr. Knight was kidnapped by this appellant, his brother Jerry Wayne Jacobs, and Thomas Eugene Brown and carried from Cullman County into Blount County where he was robbed and murdered. From the undisputed testimony it is clear that this appellant not only planned to rob Mr. Knight but to kill him also and put his body in a rock quarry that was full of water where no one would ever find his body.
Thomas Eugene Brown testified for the State in both cases against the Jacobs brothers. There were some minor discrepancies in his testimony but these discrepancies did not detract in the least from the overall conception of the robbery and murder of Mr. Knight. According to this witness's testimony John L. Jacobs told them that Mr. Knight carried between two and three thousand dollars with him at all times and this statement was made while this trio was parked in the parking lot just across the street from the Star Billiard Parlor waiting for Mr. Knight to start his walk home; that when Mr. Knight emerged from the pool hall and started walking home John L. Jacobs drove the automobile past Mr. Knight and parked on the corner of the next block. When Mr. Knight approached the car, John L. Jacobs said:
 "`Mr. Knight, do you want to go play some poker?' Mr. Knight said, `I don't reckon. Not today.' John L. then said, `Well, let me carry you home. It's fixing to rain.'"
Mr. Knight then got in the back seat of the car and instead of taking him home John L. Jacobs locked all doors to the car and drove to Blount County, Alabama, to a place on abandoned Highway 31 South. *Page 432 
Jerry Wayne told John L. to stop the car and Jerry Wayne ordered Mr. Knight out of the car and, with the sawed-off .22 caliber rifle in one hand, he took Mr. Knight by the arm with his free hand and led him into a wooded area where he was bludgeoned and shot while pleading for his life. Thomas Eugene Brown further testified that John L. walked on one side of Mr. Knight and Jerry Wayne walked on the other side. According to Brown, John L. did not go into the woods with Jerry Wayne and Mr. Knight but returned to the car and was at the car when he heard three shots. After the shots were fired Jerry Wayne came out of the woods wiping blood off his hands and when he got to the car John L. asked him why he did it and Jerry Wayne said, "Keep your cool."
All of the other facts and the physical evidence are set out in the Jerry Wayne Jacobs case to which reference is invited.
After this appellant and his brother were apprehended in North Carolina, they were returned to Alabama. This appellant was given the Miranda rights and warnings and said he understood his rights. He signed a waiver of rights form stating that he did not want a lawyer and was willing to give a voluntary statement. His statement was tape-recorded and later transcribed. The transcription was compared with the tape and found to be accurate.
There was a voir dire hearing out of the presence and hearing of the jury and at the conclusion of this hearing the trial judge ruled that the statement was voluntarily, knowingly and intelligently made and was admissible in evidence. Appellant's trial counsel suggested to the District Attorney and the trial judge that the transcribed statement not be read into the record and to the jury but that the jury be given a copy to read before final arguments were made to the jury. This suggestion was acceptable to the trial judge and the prosecutor. The trial judge requested appellant's chief counsel to tell the jury the stipulation that had been entered into.
From the record:
 "Mr. Rountree: At this time, Your Honor, the defense would make a stipulation that a statement which was given by the defendant, John L. Jacobs, was made by John L. Jacobs, the defendant, after being advised of his rights under the laws of the State of Alabama and the United States of America; and that the statement was made voluntarily by him after being informed of his rights; and, being made aware of his rights, that he did make the statement voluntarily and of his own free will and accord.
 "The Court: Is it also stipulated that he understood his rights?
 "Mr. Rountree: Yes, sir. That he understood his rights at the time that he made that statement.
 "Mr. Burttram: And that he made it after he had been fully advised of all his rights?
"Mr. Rountree: That's correct.
 "Mr. Burttram: And that, further, he signed a written waiver indicating that he understood all his rights?
 "Mr. Rountree: That is correct; and we'll so stipulate that he signed that waiver voluntarily in the presence of those two officers.
"Mr. Burttram: And Your Honor, we offer his waiver
 into evidence as State's Exhibit Number Ten, based on that stipulation.
"Mr. Rountree: No objections.
 "Mr. Burttram: And, at this time, based on that stipulation that it was voluntarily given and signed after being fully advised of his constitutional rights — both Federal and State, we offer as State's Exhibit Number Eleven, his statement — reduced to type and signed by John L. Jacobs and witnessed by Ann Clowdus, Sheriff J.C. Carr and Deputy Sheriff Fred Allcorn — as State's Exhibit Number Eleven.
"Mr. Rountree: No objections.
"The Court: All right, then. It's admitted.
 "The Court: I believe, though, that the jury is going to have to be given an opportunity to read that statement before *Page 433 
the arguments. I would think both sides would make some reference to it in your arguments — both sides — and unless the jury is familiar with the statement . . ."
Before the final arguments were made the jury was given the signed statement made by appellant and a recess was declared to give the jury ample opportunity to read the confessory statement.
The appellant's waiver of counsel is as follows:
"INTERROGATION; ADVICE OF RIGHTS
"YOUR RIGHTS
Place Blount Co. Jail
Date 8-7-76
Time 1:40 p.m.
"Before we ask you any questions, you must understand your rights.
"You have the right to remain silent.
"Anything you say can be used against you in court.
"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
"WAIVER OF RIGHTS
"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
"Signed /s/ John L. Jacobs
"Witness: /s/ G.A. Roden
"Witness: /s/ Johnny B. Nesmith%b
"Time: _________
"STATEMENT OF JOHN L. JACOBS
"Roden: State your name and date of birth.
"Jacobs: John L. Jacobs, July 12, 41.
"Roden: What is your address?
"Jacobs: Rt. 9, Box 98A, Cullman, Al.
"Roden: Let me carry you back to Friday before the 17th day of July which would be on the 16th. You and Jerry Wayne and Eugene was in Brighton, Alabama, I believe. You left to come up to Cullman. John L., I would like for you to start from that time and go all the way through Saturday night, really all the way through, about what time it was, and this type of thing. All right?
"Jacobs: We left Brighton, I guess about four o'clock Friday evening. Eugene was going to sell a 74 Mercury and something or other happened and he couldn't sell it. We came back to Birmingham.
"Roden: Friday night you went back to Birmingham?
"Jacobs: Yes.
"Roden: That was on the 16th day of July?
"Jacobs: Yes.
"Roden: All right, on the 17th what did you do? Or where did you go? "Jacobs: Went back to Cullman.
"Roden: About what time did you arrive in Cullman?
"Jacobs: About ten o'clock.
"Roden: About ten o'clock, where did you go that day?
"Jacobs: We went to Huntsville.
"Roden: Where did you go in Huntsville?
"Jacobs: Where did we go up there? We went up there to what they call the . .
"Roden: Where?
"Jacobs: Huntsville.
"Roden: Where else did you go that day?
"Jacobs: Come back.
"Roden: Did you go by Mr. Kelly's house that lives out on . . . Raymond Kelly's house? *Page 434 
"Jacobs: Yes, sir.
"Roden: Who all was out there when you got to Raymond's house?
"Jacobs: I done forgot that other man's name, some old guy was out there.
"Roden: About what time was you at Raymond's house?
"Jacobs: I don't know.
"Roden: You don't have an estimate of time, about what time it was?
"Jacobs: Un un.
"Roden: Was it in the afternoon on a Saturday, the 17th of July?
"Jacobs: It was in the evening.
"Roden: You went from Raymond Kelly's house to where?
"Jacobs: Back to Cullman.
"Roden: Back to Cullman? Where did you go to in Cullman? Did you go to the Star Pool Room? "Jacobs: No.
"Roden: Did you go in front of the Star Pool Room?
"Jacobs: We passed by there two or three times.
"Roden: Did you ever stop in front in the little parking lot across the street?
"Jacobs: Yes.
"Roden: Is that the first time that day that you had seen Walter Knight?
"Jacobs: Yes, sir.
"Roden: What did Walter do when he came out of the poolroom, Star Pool Room?
"Jacobs: He was walking.
"Roden: Which way was he walking? Do you remember?
"Jacobs: I don't know what street or nothing.
"Roden: Did he walk around to where Quick's Pool Room is at?
"Jacobs: Yeah.
"Roden: Started around that corner?
"Jacobs: Yeah.
"Roden: How far did he get around that corner?
"Jacobs: Right across the street.
"Roden: What did he do then?
"Jacobs: Turned around and walked back to the Star.
"Roden: Back to what?
"Jacobs: Star.
"Roden: Was you and Eugene and Jerry Wayne together at this time?
"Jacobs: Yes.
"Roden: Was you all watching Walter Knight?
"Jacobs: Yes.
"Roden: For what?
"Jacobs: They wanted to rob him.
"Roden: They wanted to rob him? Did you ever play poker with Walter Knight?
"Jacobs: Yes.
"Roden: Several times? Where?
"Jacobs: Over at . . . over at J.T. Hayes.
"Roden: Did you all watch him from the time he left the Star Pool Room until he started towards his home?
"Jacobs: Not all the way.
"Roden: Huh?
"Jacobs: Not all the way.
"Roden: Not all the way? Why . . . would he make a block and you all would circle the block or how did you watch him?
"Jacobs: We went two or three blocks.
"Roden: Two three blocks and he would be coming along? Where did you all pick Walter Knight up at?
"Jacobs: Across from the auto parts place.
"Roden: McMinn's Auto Parts? Right there by Vincent's Furniture? You know where the Vincent boy runs that furniture place there? Right up from White's Auto, right up the street there?
"Jacobs: Yes, sir.
"Roden: Which way did you all go when you picked him up?
"Jacobs: Right down by Deep South Creamery and back up towards . . . *Page 435 
"Roden: Where did you turn around at up there? Did you go towards Walter's house? Where did you turn around at up there? Or did you go right in front of his house?
"Jacobs: Do you know where that church house is?
"Roden: Up there where the Methodist Church . . . 7th Street Baptist is at? Went back to the left? Where did you go from there? Which highway did you take? "Jacobs: I guess it is old 231.
"Roden: Where were you sitting in the car when Walter got in?
"Jacobs: In the front seat.
"Roden: Were you driving?
"Jacobs: Yes, sir.
"Roden: Who was sitting on your right?
"Jacobs: Jerry Wayne.
"Roden: Jerry Wayne Jacobs?
"Jacobs: Yes.
"Roden: Who was sitting in the back seat?
"Jacobs: Eugene.
"Roden: Eugene? Eugene Brown?
"Jacobs: Yes.
"Roden: What was said to Mr. Knight when you all pulled up there and who said it?
"Jacobs: We asked him did he want to ride and he said yeah. And got in.
"Roden: Did you ask him did he want a ride or did he want to play poker?
"Jacobs: Well, they started talking about poker when he got in.
"Roden: Un huh. How long was it after he got in the car that one of you pulled a gun on him?
"Jacobs: It was just before we got to his house, Jerry Wayne, I shook my head at him, and he pulled a gun on him, it was already too late and done had the gun on him.
"Roden: How long had Jerry Wayne had that gun in the car?
"Jacobs: I don't know. I just met up with them.
"Roden: Did you see Jerry Wayne put the gun in the car?
"Jacobs: No, sir.
"Roden: What did Jerry Wayne say to Walter Knight when he pulled the gun out? "Jacobs: I couldn't tell you, as far as me, I don't know what he said. All I know is he said put your hands behind your head and then he told me to keep the car going thirty mile an hour so I wouldn't get stopped.
"Roden: Jerry Wayne told you that? Where did you go to from there? After you hit 31 highway?
"Jacobs: Over through Hanceville somewhere . . .
"Roden: Where did you go after you passed through Hanceville?
"Jacobs: Stayed on that highway . . .
"Roden: Did you go by Top Hat Barbeque in Blount County?
"Jacobs: I don't know if we did or not. I didn't pay no attention. Probably did.
"Roden: Probably did? Where was the money taken off Walter Knight at?
"Jacobs: I think . . . I don't know which one of them took it. It was about the time he pulled the gun on him.
"Roden: About the time he pulled the gun on him? What did he say to him, do you remember? And about where you were at?
"Jacobs: What?
"Roden: Whoever said what to him?
"Jacobs: I don't remember.
"Roden: You don't remember? About where were you at when the money was taken off of him?
"Jacobs: About when he pulled the gun, about where you get to that church.
"Roden: Let's see, you went up, went by McMinn's Auto Parts going south and then to the Deep South Creamery there and you taken a right and you went up to West Main and taken a left and went to the 7th Street Baptist Church, 7th Street and take another left, where in that vicinity was the money taken from him?
"Jacobs: Between that red light and where we turned. *Page 436 
"Roden: Between where the seven-eleven is on West Main over there and the red light at the 7th Street Baptist Church?
"Jacobs: But I don't know which one of them got it. "Roden: Well, after you got . . . you said you didn't remember passing the Top Hat Barbeque, but you remember that you probably did pass it, what happened after you passed . . . day that area right there? That barbeque, where did you go then?
"Jacobs: We went on down there past a bridge or something, seen that road and Jerry said stop right here.
"Roden: Was it off the main highway 31, was it an off road or what?
"Jacobs: It looked like an old road, an old highway or something.
"Roden: Had you ever traveled that old highway before?
"Jacobs: Yeah, I had drove a truck up and down there all the time.
"Roden: All right, Jerry Wayne Jacobs said stop the car right here and you was on that old road, old 31 highway, right?
"Jacobs: Yes, sir.
"Roden: What happened when the car was stopped?
"Jacobs: He told Walter to get outside.
"Roden: Get what?
"Jacobs: Get outside.
"Roden: Did he get out?
"Jacobs: Yes.
"Roden: Did you all force him out of the car?
"Jacobs: No.
"Roden: Then what happened?
"Jacobs: He took him down in the woods, I though he was just going to leave him but I heard a shot. I asked Jerry how many times did he shoot him and he said three.
"Roden: Did you go with him down there in the woods?
"Jacobs: No, I didn't go all the way down.
"Roden: How far did you walk with Jerry Wayne Jacobs?
"Jacobs: About fifty yards, I guess.
"Roden: Which hand did you have, or arm did you have walking . . .
"Jacobs: Neither, I never laid a hand on him.
"Roden: Which hand did Jerry Wayne have him by, or arm.
"Jacobs: I couldn't tell you.
"Roden: You couldn't tell me?
"Jacobs: I didn't know.
"Roden: Which hand did he have the gun in?
"Jacobs: I don't know that either, cause I wasn't even watching them. Probably right — he's right handed.
"Roden: What did Mr. Knight say?
"Jacobs: I don't know, I was too far away from them to hear him say anything.
"Roden: What did he say when he got out of the car? Did he say anything?
"Jacobs: I don't know.
"Roden: What did he talk about in the car, if anything?
"Jacobs: Nothing.
"Roden: Nothing?
"Jacobs: Every time he would start to say something, Jerry would tell him to shut up.
"Roden: After Jerry Wayne led him down the path there did you go down there with him, that little old wooded path? Going off the creek to the left in there? He went to the left?
"Jacobs: Yeah, he went to the left.
"Roden: Did you go down that path with him?
"Jacobs: No, me and Eugene went over the hill in the pit.
"Roden: Why did you go over there?
"Jacobs: We went over there and then got in the car.
"Roden: How many shots did you hear fired?
"Jacobs: I didn't hear but one. *Page 437 
"Roden: Didn't hear but one? Did you know that Walter Knight carried a lot of money on him?
"Jacobs: Yeah.
"Roden: What happened after . . . what did Jerry Wayne say when he came back up out of the wooded area there?
"Jacobs: He just said `let's go.'
"Roden: He didn't say anything about it?
"Jacobs: I said, `What did you shoot him for?' and he said, `I had to, if I didn't he would identify us.'
"Roden: Where did you go from there?
"Jacobs: We went to Conwell, Texas.
"Roden: Let me ask . . . let me back up a few minutes. When Jerry Wayne came out of the woods, what did he have in his hand?
"Jacobs: He had a gun.
"Roden: What else?
"Jacobs: I don't know.
"Roden: Did he have Mr. Walter Knight's shoes?
"Jacobs: I think he left them in the car.
"Roden: Left them in the car before he carried him into the woods?
"Jacobs: I believe he did.
"Roden: What did he tell him about the shoes?
"Jacobs: I don't know.
"Roden: Did he tell him to take his shoes off?
"Jacobs: He probably did if he took them off.
"Roden: You stopped there, were you still in the car when Jerry Wayne took him out? Did you say say anything to Jerry Wayne?
"Jacobs: No, not right then.
"Roden: All right, right after you went down in the woods, you thought you heard one shot fired?
"Jacobs: That was after we had done circled back around.
"Roden: When he came back up from out of the woods, where did you go from there?
"Jacobs: We went to Texas.
"Roden: I mean on down the road, did you go on down 31 highway?
"Jacobs: Yes, sir.
"Roden: South?
"Jacobs: Down on through Birmingham.
"Roden: All right. About a half a mile or a mile from where Mr. Walter Knight was shot, which one of them throwed some black shoes and stuff out of the car?
"Jacobs: I believe Eugene did.
"Roden: Eugene throwed them out? Whose shoes were they?
"Jacobs: Jerry Wayne's.
"Roden: Jerry Wayne's? Why did he throw them out?
"Jacobs: He had on Walter's.
"Roden: He had put Walter Knight's shoes on then?
"Jacobs: I asked how could he wear them and he just shook his head.
"Roden: What else was in there that was throwed out? On the side of the road there?
"Jacobs: I don't know, he just throwed a whole sack of stuff out.
"Roden: Was there a jar of salad dressing in there?
"Jacobs: You mean a mayonnaise jar?
"Roden: Yeah.
"Jacobs: I believe there was.
"Roden: Did you get any candidate's cards out of Mr. Knight's pocket?
"Jacobs: Candidate cards? "Roden: Candidate cards with a man's picture on it running for office, you know. That candidates hand out at election time.
"Jacobs: I didn't pay no attention to what they got.
"Roden: What kind of shoes was these that they throwed out of the car?
"Jacobs: Just some white slippers is all I know.
"Roden: Just a white slip-on? What about the paper bags in the car, did they throw them out? *Page 438 
"Jacobs: Paper bags?
"Roden: Paper bags. Why did they throw them out?
"Jacobs: I don't know.
"Roden: Did you see blood on the paper bag? That was in the car?
"Jacobs: No.
"Roden: Did Jerry Wayne have blood on him, on his hands or anything, did he wipe his hands on anything?
"Jacobs: No, sir. Not as I know of.
"Roden: That was about a mile below where Mr. Walter Knight was shot, right? About a half a mile or a mile there on 31 where the stuff was thrown out?
"Jacobs: Seems like it was on the Interstate.
"Roden: On the Interstate or right before you get on the Interstate? Right before you get on it, wasn't it, it would be on the right, on the right side of the road?
"Jacobs: Yes.
"Roden: When you left that area there, after the clothes . . . shoes were thrown out and where did you go?
"Jacobs: To Conwell, Texas.
"Roden: Did you go through Mississippi or Louisiana?
"Jacobs: Yeah, we went right through Mississippi and Louisiana and into Texas.
"Roden: After you got down in Mississippi, what happened?
"Jacobs: We went on in to New Orleans.
"Roden: Went on in New Orleans? Did you have anything in the car when you reached . . . when you were down in Mississippi? Like a weapon?
"Jacobs: He had that other gun.
"Roden: What kind of gun was it?
"Jacobs: I don't know.
"Roden: What caliber?
"Jacobs: A .22.
"Roden: A .22? Do you know where he throwed it out at in Mississippi?
"Jacobs: He threw it off of the bridge.
"Roden: Was you there when he throwed it out?
"Jacobs: We all were.
"Roden: You all were there? What did he say when he throwed the gun away?
"Jacobs: He just took it out there and throwed it away and we went on to Texas.
"Roden: What did he say about it when he threw it away?
"Jacobs: He just said, there it goes.
"Roden: Did he say something about not getting caught or anything like that?
"Jacobs: No, he didn't tell me that.
"Nesmith: John L., describe the gun in detail to me.
"Jacobs: It was just one about that long.
"Nesmith: How long would you say, about fourteen or fifteen inches?
"Jacobs: Yes, sir.
"Nesmith: What color of stock did it have?
"Jacobs: Brown.
"Nesmith: Brown, about the color of that box over there? "Jacobs: It was a little darker, just a little bit darker.
"Nesmith: Mahogany looking?
"Jacobs: Sorta like that door over there.
"Nesmith: Had the barrel been sawed off of this gun?
"Jacobs: Yes, sir.
"Nesmith: Who sawed the barrel off?
"Jacobs: I don't know.
"Nesmith: Did it have tape around it?
"Jacobs: Black tape.
"Nesmith: Black tape. When you and Jerry Wayne got out of the car, are you telling us that you did not walk into the woods at all with Jerry Wayne?
"Jacobs: No, I said me and Eugene walked down in the woods over the hill and then back to the car.
"Nesmith: But you did help get Walter out of the car and get him started into the woods? *Page 439 
"Jacobs: No, sir, he got out of the car by himself and Jerry Wayne went around the back to him.
"Nesmith: Who else did you all talk about going to rob in Cullman, Alabama, beside Mr. Knight?
"Jacobs: Nobody.
"Nesmith: Did you not mention Hank Williams, Jr.'s name?
"Jacobs: Who?
"Nesmith: Hank Williams, Jr., had you all not talked about robbing him?
"Jacobs: No, I don't even know the man.
"Nesmith: What time did you people get Walter Knight in Cullman, Alabama? What time of the day was it?
"Jacobs: I guess it was five o'clock.
"Nesmith: Approximately five o'clock? On Saturday?
"Jacobs: I believe it was. "Nesmith: That would have been July 17th, 1976. What kind of car were you in at that time, describe it.
"Jacobs: It was a '74 white with black top Mercury, Marquis.
"Nesmith: Is it the car that was stolen out of Florida?
"Jacobs: Yeah, Eugene said it was his to start with, and then he started to sell it, him and Jerry Wayne brought it out of Florida.
"Nesmith: Describe again where you got Walter in Cullman?
"Jacobs: Across from . . . what do you call it? Some auto parts.
"Nesmith: McMinn Auto Parts?
"Jacobs: Yeah.
"Nesmith: I'm showing you a picture here of an elderly gentleman, is that Walter Knight? The one you people picked up?
"Jacobs: Yes, sir.
"Nesmith: The same Walter Knight that you played poker with on numerous occasions, correct?
"Jacobs: About two or three times.
"Nesmith: Did you people go back to Brighton, Alabama after you killed Walter?
"Jacobs: Yes, sir.
"Nesmith: You did?
"Jacobs: Yes, sir.
"Nesmith: Did you not hear Mr. Knight ask `Please don't kill me now' or something in those words? When Jerry Wayne was taking him down into the woods?
"Jacobs: I didn't hear him say nothing, I was too far away.
"Nesmith: What did Jerry Wayne say about killing Mr. Knight, how come he had to shoot him the way he did?
"Jacobs: He said he wouldn't identify him now.
"Nesmith: You made the statement to Jerry Wayne, you wanted to know why he shot him that way or something.
"Jacobs: I said `Why did you shoot him, you didn't have to shoot him. You could have just left him.'
"Nesmith: Did Mr. Knight try to run after he got into the woods?
"Jacobs: I don't know and I was too far away, I didn't see him.
"Nesmith: But you knew when you left that Mr. Knight had been killed though, didn't you?
"Jacobs: Yeah, after he . . . I asked him how many times did he shoot him and he said three times.
"Nesmith: Did he brag about how the old man died or anything when he shot him?
"Jacobs: No, he didn't say.
"Nesmith: I mean, you just don't shoot somebody every day, you know that would be a thing to shoot somebody.
"Jacobs: I can't even shoot a dog.
"Nesmith: Had Walter Knight ever mistreated you all in any way?
"Jacobs: No, sir.
"Nesmith: You just knew that he carried a large sum of money?
"Jacobs: Everybody knowed it, everybody in Cullman.
"Nesmith: When did Eugene Brown get away from you all or leave you all? *Page 440 
"Jacobs: Ocala, Florida.
"Nesmith: Ocala? Or Haynes City, Florida?
"Jacobs: I thought it was Ocala.
"Nesmith: Did you all stop at a truck stop?
"Jacobs: We stopped at a truck stop there in Ocala.
"Nesmith: And that's where he separated from you all, wasn't it?
"Jacobs: Yeah.
"Nesmith: How did he get away from you all without you all knowing it?
"Jacobs: We was just going to split up and catch a ride. So he stayed there, he walked on up and he caught a ride and went on.
"Nesmith: He didn't go out a bathroom window?
"Jacobs: No, sir, he said, `We'll split up and we'll get a ride better.' He stayed behind and we walked about a hundred yards up above him and a station wagon came by and picked him up. An old Ford station wagon. Then we caught a ride with somebody going to part of North Carolina.
"Nesmith: What did you do with the .45 pistol that you had with you?
"Jacobs: We didn't have no .45, not as I know of. If they had one, they didn't show it to me.
"Nesmith: Jerry Wayne was supposed to have had one after you got rid of that gun in Mississippi.
"Jacobs: If he did, I didn't never get to see it.
"Nesmith: Did you all go on to New Orleans after Mississippi?
"Jacobs: . . . . .
"This tape was started at 1:40 p.m. and completed at 2:05 p.m. the 6th day of August, 1976 in the Blount County Sheriff's Office.
 "/s/ John L. Jacobs
John L. Jacobs
"WITNESS:
"/s/ Ann Clowdus
"/s/ J.C. Carr
"/s/ Fred Allcorn"
Appellant did not testify though he was advised by the trial judge he had that right. He was further advised that if he elected not to take the witness stand it would create no presumption of guilt against him and that the District Attorney would not be allowed to comment on his failure to testify. Appellant replied, "I already said my statement. I haven't got nothing to say." Thereupon the defense rested without producing any evidence.
Appellant made a written motion to exclude the State's evidence on the ground that the State proved that appellant had participated in the robbery of Mr. Knight but the State failed completely to prove the allegations of the indictment. After a lengthy argument in support of the motion to exclude the trial court overruled and denied the motion, and Mr. Rountree reserved an exception to the Court's ruling.
The Court charged the jury at great length on the law of homicide applicable to this case including the law of aiding, abetting and conspiracy. No exceptions were reserved to the oral charge and no written instructions were requested.
The jury deliberated 42 minutes and returned to the courtroom with the following verdict:
 "We the jury find the defendant John L. Jacobs guilty of first degree murder with aggravated circumstances as charged in the indictment, and we fix the punishment at death."
Mr. Rountree requested that the jury be polled. The Court polled the jury and they separately and individually stated that was their verdict.
The Court asked appellant if he had anything he wished to say and he replied, "No, sir." The Court then adjudged the defendant guilty of first degree murder committed during a robbery in which the victim was intentionally killed.
The Court informed the defendant that under the law he was required to hold a hearing to determine whether or not the defendant should be sentenced to death or *Page 441 
to life imprisonment without parole. The Court set October 14, 1976, for the hearing stating, "And if there are any extenuating circumstances that might be presented, we will have that hearing at that time."
Appellant filed a motion for a new trial and this motion was set for hearing on October 14, 1976, and continued to October 19, 1976, due to the illness of Mr. Rountree. The main grounds of the motion for a new trial were the grounds asserted by appellant in his motions for a continuance and change of venue. He did allege that the verdict was contrary to the law and the weight of the evidence. No evidence whatsoever was offered during the hearing on the motion for a new trial.
In re-scheduling the motion for a new trial and the date to make a determination on whether the death penalty would be imposed or a sentence to life imprisonment without parole the Court made the following comment:
 "The Court: Well, the law specifically says that if the Court appoints an attorney for a defendant, he must be afforded legal counsel having no less than five years prior experience in the actual practice of criminal law.
 "Of course, Mr. Rountree has been in the actual practice of criminal law for some fifteen or sixteen years and further meets the requirements. I appointed Mr. Prickett to assist.
 "Mr. Prickett is a very competent lawyer. I'll agree with that; but he still does not have the experience required by the Act; and this hearing is a part of the proceedings.
 "Mr. Burttram: I'm familiar with the five year requirement, Your Honor.
 "The Court: I have checked with the hospital and Mr. Rountree is in the hospital with no release date set as yet.
 "Under the circumstances, I don't anything we can do except continue the case until Mr. Rountree is available, or at least until other counsel with five years experience can be appointed to familiarize himself with the case. So, you are making that motion (for a continuance) Mr. Prickett?
"Mr. Prickett: Yes, sir.
 "The Court: Is that also according to your wishes, Mr. Jacobs?
"The Defendant: (nods head affirmatively).
 "The Court: All right. So, I'll tentatively re-set this hearing for October 19th at one o'clock. That will be Tuesday of next week.
 "Of course, if Mr. Rountree's condition is not improved enough for him to be here, it may be necessary to re-schedule it.
 "Mr. Prickett: Your Honor, I'll try to keep the Court posted on any changes that occur in the condition of Mr. Rountree.
"The Court: All right."
At the hearing on October 19, 1976, Mr. Rountree appeared and made known to the Court that he wanted to get the motion for a new trial out of the way before proceeding with the hearing to determine if the death penalty should be imposed. No new evidence was presented but Mr. Rountree argued at length that the trial court erred in not granting a continuance and in not granting the motion for a change of venue because of the widespread publicity that resulted when the death penalty was imposed in the companion case of Jerry Wayne Jacobs. The Court responded as follows:
 "The Court: As I recall, we had sixty-eight jurors from which to select the trial or petit jury. After the twelve were selected in the trial of Jerry Wayne Jacobs, the other fifty-six were directed to leave the courtroom and stay out of the courtroom until they reappeared at nine o'clock on Thursday morning. I believe the jury selected for the trial of Jerry Wayne Jacobs was not selected until early Tuesday morning.
 "The jurors were all examined and questioned at length on Monday; and when they reassembled on Thursday, they were each individually questioned at length; and some of them had not even heard of this conviction of Jerry Wayne Jacobs — about a third of them had not even heard about it. *Page 442 
 "None of them had heard any of the case. All that any of them knew about it, as I recall, were just some of the skimpy sketches that had appeared in the paper; and I stated then and I am convinced that probably that jury that was selected to try this case knew less about the facts of it and had been exposed to the previous verdict less than any jury that could possibly have been selected or could be selected at a later date.
 "We had taken precautions, and so had all of the officers, to keep down all the publicity until the other jury was selected and isolated and held together without having any possible contact with outside sources.
 "Furthermore, jurors, in my opinion — even though they believe in the death penalty — are very reluctant and cautious to use that penalty . . . and properly so.
 "I recall the questioning — and you and Mr. Prickett did a good job of questioning them — and they all stated that they could go by the evidence that came from this witness stand and that alone. Several were asked if they thought the defendant could get a fair trial here; and each one that was asked that question replied: `Yes.'
 "As far as the grounds for the motion for new trial, I think that jury that was selected that day knew less about the case, less about the previous verdict; and therefore, would be less swayed by any previous verdict than any that could be obtained now. Because, as you know, there has been some publicity given to the other verdict — but not until the jury in this case was selected and isolated from all outside knowledge and influence.
 "I will have to overrule the motion for new trial; and it is so ruled.
"Mr. Rountree: We respectfully except, Your Honor."
The Court then asked counsel for appellant if they had any evidence to offer, any statements to make, or anything in the way of mitigation of the sentence. Counsel made known to the Court they did not intend to put on any evidence because they were satisfied with the testimony of Eugene Brown that appellant participated in the robbery of Mr. Knight but he was not the "trigger man"; that the actual murder was committed by Jerry Wayne Jacobs.
The trial judge made the following findings:
 "The Court: Of course, I heard all of the evidence in the case. It is true that, perhaps from the evidence in the case, that this particular defendant did not fire the fatal shots; but the evidence certainly establishes a conspiracy. And it also establishes that this defendant was the one that actually established and set up and put in motion the conspiracy.
 "He is the one who lived in the area. He is the one who knew Mr. Knight. As I recall, Brown was from Brighton down in Jefferson County and did not know Mr. Knight; while the other Jacobs boy was from Winter Haven, Florida, and did not know Mr. Knight. It was this defendant who, then, actually formulated and planned and devised and schemed this conspiracy.
 "And, of course, we are all familiar with the law that if two or more people enter into an illegal conspiracy, then the acts of one are attributable to each member of the conspiracy as long as such acts have any reasonable relation to the planned illegal acts.
 "It is certainly logical to assume that the killing was actually for the benefit of this defendant here; because, had Mr. Knight been released and found his way back home, this is the only one of the three defendants that he could have identified. It might have led, eventually, to the identification of the other two; but this is the only one of the three that Mr. Knight could have possibly identified, from all of the evidence.
 "It stands to reason, therefore, that this defendant had more to gain by the killing of Mr. Knight than either of the other two. And, in planning this robbery and this crime, it is inconceivable that he would not have thought of that. It is *Page 443 
inconceivable that he would take steps to bring about a robbery of Mr. Knight without taking some steps to avoid a certain identification and arrest.
 "There being no mitigating circumstances, I do not see that the verdict of the jury should be set aside; and, accordingly, that will be my ruling.
"Mr. Roundree: Your Honor, we respectfully except to
Your Honor's ruling.
 "The Court: Come around, Mr. Jacobs. (Whereupon, the defendant and his counsel approached the Bench.)
 "The Court: Let me point out the following. You have heard what I've had to say. I find the following aggravated circumstances to be in existence:
 "First, that the victim in this case, Mr. Walter Robert Knight, was intentionally killed while you and your co-conspirators were engaged in a robbery of the victim.
 "Also, that this killing had all of the elements and ingredients of first degree murder; and it was committed intentionally during the course of the robbery of the victim.
 "I also find that this capital felony was committed for the purpose of avoiding or preventing a lawful arrest.
 "I also find that this capital felony was especially heinous, atrocious and cruel, in that you — and you did this — you tricked this man into coming into your automobile, you drove the car, it was your car and you drove it down into this county into a remote area, his shoes were taken off of him, and he was led out into the woods where he couldn't run or get away.
 "Whether or not you actually pulled the trigger, you set in motion the forces that led to the death of Mr. Knight."
Thereupon the Court imposed the death penalty on John L. Jacobs.
We think, and hold, that the evidence in this case fully supports the findings made by the trial court justifying the imposition of the death penalty. The evidence is without dispute that this appellant was the architect of the scheme to rob Mr. Knight. He was the only one of the trio who knew Mr. Knight and the only one who Mr. Knight could have identified had his life been spared and, thus, had more to gain by Mr. Knight's death than any of the three robbers, kidnappers and murderers. The evidence shows conclusively that John L. Jacobs had long planned to rob Mr. Knight and had made the statement that if Mr. Knight attempted to shoot him he would put his body in a rock quarry full of water and his body would never be found. He tried to borrow a pistol to carry out his scheme to rob Mr. Knight and dispose of his body. Appellant was the arch conspirator in this sad and senseless murder. He drove the death car before and after the murder and was a party to disposing of all incriminating evidence that could possibly lead to the identity of the perpetrators of this heinous, atrocious, cruel, conscienceless, and pitiless crime.
Appellant's counsel contend that though he participated in the robbery of the victim he took no part in the actual shooting death of Mr. Knight and, therefore, the death penalty was undeserved. We would remind counsel for appellant that one of the aggravating circumstances in Alabama's new death penalty law is a section which provides:
 "The capital felony was committed while the Defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit rape, robbery, burglary, or kidnapping for ransom . . ." (Emphasis supplied).
The above quoted section squarely fits this case in every respect. Appellant received a fair and impartial trial and that is all that he was entitled to under the law. Death is the penalty of the law, and the penalty is just.
The trial court was pre-eminently correct in charging the jury on the law of conspiracy, aiding and abetting. Likewise, the Court did not err in denying the motion for a continuance and in overruling the motion for a change of venue. Jenkins v.State, Ala.Crim.App., 337 So.2d 72; Jordan v. State,56 Ala. App. 55, 318 So.2d 793. *Page 444 
This brings us to a consideration of a very troublesome problem presented on this appeal by the following provision of this state's new death penalty law:
 "Each person indicted for an offense punishable under the provision of the Act who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years prior experience in the active practice of criminal law."
Just what is meant by this provision is an enigma. We have not been cited to a case, nor has our research revealed one, that gives a concise definition of what is meant by such a provision.
We are thoroughly familiar with the long line of cases, both State and Federal, dealing with the effective assistance of counsel and in the record before us, we think that Mr. Rountree and his co-counsel, Mr. Prickett, rendered appellant excellent services in his defense. We think appellant had "effective assistance" of counsel under Taylor v. State, 291 Ala. 756,287 So.2d 901, and Gore v. State, 45 Ala. App. 146, 227 So.2d 432.
After the motion for a new trial was overruled notice of appeal was given and trial counsel was appointed to represent appellant on appeal.
New counsel appeared in the case and filed what they termed a "Motion to Supplement the Record or in the alternative a Motion for a New Trial." This motion was filed two months after the trial court had lost jurisdiction and the Attorney General filed a motion to strike this delayed motion. If this was not a death case, we would unhesitatingly grant the motion to strike but under the circumstances we will not grant the motion.
In the meantime the original trial judge retired from the bench and the new Circuit Judge set the delayed motion for a hearing on January 31, 1977. At this hearing Mr. Rountree testified that he had not been in the active practice of criminal law for five years and the Assistant District Attorney so stipulated.
At this hearing Mr. Rountree, Mr. Prickett, and Judge L.P. Waid gave testimony. Judge Waid presided over appellant's trial.
It should be pointed out that during this post-conviction hearing counsel for the appellant stated repeatedly that the competency of Mr. Rountree was not the issue, but the only issue was whether or not he complied with the provision of the new death penalty law that counsel for an indigent defendant in a capital case must have had five years experience in the actual practice of criminal law.
Mr. Rountree testified that his practice was primarily real estate law; that 95 to 99 percent of his practice was in the field of title work, making abstracts, writing title insurance, probating wills and handling estates. He said that his law office was in the Blount County Abstract and Land Title Company. He was admitted to the Bar in 1966.
He further testified that prior to this case he had never tried a murder or a manslaughter case. He did admit that he had represented defendants charged with felonies and misdemeanors since his admission to practice law and he felt that he had been appointed in his share of the cases including burglary and grand larceny cases. He also admitted that he had been retained in a number of felony cases but could not remember the number.
On cross-examination he testified that in 1975 he was employed to represent a defendant charged with arson in the first degree for which he was paid a fee of four thousand dollars.
He further testified that either he or his co-counsel attended the entire trial of the Jerry Wayne Jacobs case which was tried immediately before the John L. Jacobs case and that the District Attorney made available to them all the information in his office concerning the case to which they had been appointed. He stated he represented John L. Jacobs to the very best of his ability and felt he did as good a job as any lawyer anywhere could have done under the circumstances. He further testified that he was familiar with the provisions of the new *Page 445 
death penalty law requiring the appointment of counsel who had five years prior experience in the practice of criminal law.
On redirect examination he admitted that he was familiar to some extent with the case of Furman v. Georgia, but that he was not familiar with and had not read the post-Furman cases ofGregg, Proffitt, Jurek, Woodson, and Roberts. He stated that at the penalty hearing he and his co-counsel made lengthy legal arguments pointing out to the Court that John L. Jacobs was not the man that fired the shots that killed Mr. Knight and that while Mr. Jacobs was guilty of participating in the robbery of Mr. Knight, he did not kill him. He felt that this argument was enough to show mitigating circumstances that would cause the Court to sentence this appellant to life in prison without parole.
Judge Waid testified that Mr. Rountree was a very competent lawyer and that he did an excellent job in representing John L. Jacobs. He stated that there were only about eight lawyers practicing in Blount County at the time this case was tried and he appointed those lawyers who had been practicing more than five years in both cases where it was obvious that there was no conflict of interests. He stated that none of the lawyers practicing in Blount County wanted to handle criminal cases but that he made it a practice to appoint lawyers on a rotation basis. He said that he was thoroughly familiar with the five year experience provision in the new death penalty law concerning the appointment of counsel in indigent cases. He stated that he was in disagreement with the affidavit filed by Mr. Rountree in which he stated, "I do not feel that I have the expertise of experience in criminal law to defend a person faced with a capital crime," because he felt that Mr. Rountree was competent and qualified in every way and it was his turn to take the case. Judge Waid further testified that when he was District Attorney in 1968 or 1969 he was prosecuting a case of robbery and Mr. Rountree was the defendant's counsel. He stated that this was a bad robbery case and the defendant went into a service station and knocked the attendant in the head and tied him up. Then he cut the telephone wires and took all the money out of the cash register. He said that Mr. Rountree did such a good job in defending this man that he got him off with a charge of assault and battery. He said he had seen Mr. Rountree try lots of cases and that he was certainly a competent lawyer and that he had been in as many criminal trials as any lawyer in the county.
Mr. Thomas B. Prickett, II, testified for the State at this hearing. According to his testimony he was licensed to practice law in 1975 and had been actively engaged in the practice of law in Blount County since that time and that he had been appointed in several criminal cases. He also stated that he does take criminal cases on a fee basis. He further testified that he or Mr. Rountree was present in court at all times during the Jerry Wayne Jacobs trial and they were thoroughly familiar with the overall facts presented in their case; that he considered himself competent to defend criminal cases.
On cross-examination he stated he had never defended a murder or manslaughter case before and he was not familiar with the post-Furman cases dealing with the death penalty laws of Florida, Georgia, Texas, North Carolina, or Louisiana; that he did not have access to those cases.
At the conclusion of this testimony the trial judge overruled and denied the motion for a new trial.
The Circuit Judge Honorable H.E. Holladay then appointed Morris S. Dees and John Carroll of the Southern Poverty Law Center in Montgomery, Alabama, to represent John L. Jacobs on appeal.
As we have pointed out, we think that Mr. Rountree and his co-counsel rendered this appellant effective assistance of counsel in the trial of this case. However, this Court is interested in knowing the number of criminal cases that Mr. Rountree has handled since his admission to the Bar in 1966, whether by appointment or on a retained basis, and we remand this case to the Circuit Court of Blount County to conduct an evidentiary hearing. At this hearing the *Page 446 
records of the Circuit Court of Blount County, Alabama, showing the number of cases in which Mr. Rountree was counsel for the defendants should be introduced in evidence. This hearing should be conducted expeditiously, with the defendant and his attorneys present.
The lower court is further instructed that a full record be made of the hearing; that the cases in which Mr. Rountree appeared as counsel be documented and included in the transcript showing the nature of the cases in which he was appointed by the Court and the cases in which he was retained; and that a transcript of these proceedings under the Seal of the Clerk be promptly forwarded to this Court. See Seibold v.State, 287 Ala. 549, 253 So.2d 302.
Remanded for further proceedings in accordance with this opinion.
All the Judges concur.
After Remandment
This case was remanded for the limited purpose of having the official Court records of Blount County, Alabama, in which Mr. Thomas Rountree appeared as counsel in criminal cases, either by appointment of the Court or on a retained basis, introduced into evidence at a hearing and a supplemental transcript sent to this Court. Evidently our directive was misinterpreted as the hearing took on broader dimensions than was intended by our order of remandment. We did not order or seek further testimony.
We have received the official trial docket sheets, criminal division, of the Circuit Court of Blount County showing the number of criminal cases handled by Mr. Rountree since he was admitted to the practice of law in 1966. In addition to this the supplemental transcript contains the testimony of Hon. John Bobby Green, Circuit Clerk of Blount County, the testimony of Hon. Charles Robinson, former District Attorney for the Thirtieth Judicial Circuit made up of Blount and St. Clair Counties, and the testimony of Hon. Thomas Lee Rountree. The trial court permitted defense counsel, over the State's objection, to introduce an affidavit of Hon. Garry Cooper, a member of the House of Representatives from Mobile County, in which he stated his reasons for offering an amendment to Alabama's new Death Penalty law to include the provision mandating that appointed counsel must have "no less than five years prior experience in the active practice of criminal law."
According to the testimony of the Circuit Clerk, who had the criminal trial docket sheets before him, during the years from 1966 to 1976, Mr. Rountree appeared as counsel in 99 criminal cases. Of this number of criminal cases Mr. Rountree was retained in 28 cases and appointed by the Court in 71 cases. During this period of time Mr. Rountree was appointed in two cases, rape and robbery, in which the maximum punishment was death.
Mr. Robinson testified that he was District Attorney for Blount County from January, 1971, until October 31, 1975, and that during this four years Mr. Rountree was one of six lawyers in Blount County who practiced criminal law.
Mr. Robinson testified that the criminal docket was set two or three times each year, and most of the time there would be twenty-five to forty cases on each docket, and that Mr. Rountree had two to three cases on every criminal docket. He stated that he opposed Mr. Rountree in cases of rape, arson in the first degree, burglary and conspiracy to commit murder. Mr. Robinson concluded his testimony by saying that Mr. Rountree was engaged in the practice of criminal law and that, in his opinion, he was "competent as a criminal attorney."
On cross-examination of Mr. Rountree it developed that he had represented criminal defendants in a wide variety of cases including: false pretense cases, burglary cases, and cases involving robbery, grand larceny, leaving the scene of an accident, possession of a still, assault with intent to ravish, rapes, arson, assault with intent to murder, conspiracy to commit murder, forgery, selling mortgaged property, buying, receiving and concealing stolen property. *Page 447 
He handled several cases of these types more than once.
At this hearing defense counsel brought out that during this same period Mr. Rountree had handled over four thousand civil transactions. We are not concerned with the civil cases in which Mr. Rountree was engaged, but this tends to show that he was and is a busy and active practicing lawyer. We are concerned only with whether he met the requirements of Section 13-11-8, Code of 1975, "Appointment of experienced Counsel for indigent defendants."
The record and exhibits now before us clearly show:
 1. That Mr. Rountree had practiced law in Blount County for almost eleven years prior to the appointment to defend appellant.
 2. That he had practiced criminal law at the call of the criminal docket in Blount County for ten years.
 3. That he had either been retained or appointed to represent defendants charged with more than 25 different crimes.
 4. That he had represented clients charged with criminal offenses on at least 84 occasions according to his own files, though the records in the Circuit Clerk's Office showed 99 criminal cases.
 5. That he had previously tried two or more capital felonies.
 6. That he considered himself competent and was considered a competent attorney in the criminal practice by the appointing judge and a former District Attorney.
 7. That Mr. Rountree accepted his pro rata share of appointed criminal cases continuously prior to his appointment in this case.
 8. That there were no attorneys in Blount County who were considered "criminal law specialists" at the time of Mr. Rountree's appointment to represent appellant.
 9. That his appointment was in keeping with the provision of not less than five years prior experience in the active practice of criminal law.
We hold without the slightest hesitation that Mr. Rountree's appointment to represent this appellant fully and completely complied with Section 13-11-8, Code of 1975.
In Pineda v. Bailey, 340 F.2d 162 (Fifth Circuit), we find the following:
 "It has been definitely held that the 6th Amendment to the United States Constitution, as applied to the states through the 14th Amendment, secures the right of an indigent state prisoner to the assistance of counsel in a case of this kind. As this Court has recently written, more than a formal appointment of counsel is required. There must be effective assistance of counsel. Effective assistance does not mean that a defendant is entitled to have the best counsel appointed, or any particular counsel, but it does mean that he must have such assistance as will assure him due process of law. As we said in MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960), `We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.'"
We are in full accord with the above quotation and entertain not the slightest doubt that the appointment of Mr. Rountree and his representation of appellant squarely met all the requirements of due process.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 448